483 So.2d 987 (1986)
RAYNE STATE BANK AND TRUST COMPANY
v.
NATIONAL UNION FIRE INSURANCE COMPANY et al.
No. 85-C-1200.
Supreme Court of Louisiana.
February 24, 1986.
*988 Oscar Boswell, II, Crowley, for plaintiff-applicant.
John Hutchison, John P. Wolff, III, Voorhies & Labbe Lafayette, Edward B. Dubuisson, Dubuisson & Dubuisson, Opelousas, Homer Ed Barousse, Jr., Edwards, Stefanski & Barousse, Crowley, J. Walter Ward, Jr., Christovich & Kearney, New Orleans, for defendant-respondent.
L. Lane Roy, Lafayette, for amicus curiae.
DIXON, Chief Justice.
Rayne State Bank and Trust Company filed this legal malpractice suit against attorney Noble Chambers and his law firm Aaron, Aaron & Chambers, attorney Edward Heller and his law firm Bronfin, Heller, Feldman & Steinburg, and National Union Fire Insurance Company, the legal malpractice insurer for both firms.
Rayne State Bank asserts that it was damaged as a result of a pair of allegedly fatally defective mortgages drafted by Chambers and reviewed by Heller. The district court did not decide the issues on the merits, holding after a full hearing that the plaintiff's legal malpractice suit against all defendants was barred by the lapse of the one year prescriptive period applicable to actions ex delicto. The court of appeal determined that the case against Heller and his law firm and insurer should have been dismissed on the merits, but affirmed the district court's determination that the running of prescription barred the suit against Chambers and his law firm and National Union.[1]
Rayne State Bank applied to this court for writs to contest the court of appeal's decision sustaining defendant Chambers' peremptory exception of prescription, and its decision to dismiss the suit against Heller on the merits.
In January of 1979 Noble Chambers, acting on behalf of two of his long term corporate clients, Tobilar, Inc. and Rimmer & Garrett, Inc.,[2] prepared two acts of mortgage, each entitled "Special Mortgage with Chattels," to secure loans to each corporation made by Rayne State Bank. Both mortgages covered tracts of land owned by these companies as well as heavy equipment used by the companies to conduct road construction operations. These mortgages were executed to secure the loan of $2,000,000 to Tobilar and $1,000,000 to Rimmer & Garrett from Rayne State Bank. In connection with these loans, Rayne State Bank requested two title opinions from Mr. Chambers on the immovable property involved, which Chambers or a member of his firm sent to the bank a few days after the mortgages were executed.
These two mortgages drafted by Mr. Chambers failed to specify the location of the chattels involved, as was then required by the Louisiana Chattel Mortgage Act under R.S. 9:5352,[3] a defect which might have under some circumstances rendered the mortgages invalid as to the chattels.[4] There were evidently other minor defects in the documents, including defects in the corporate resolutions authorizing the mortgages.
Shortly after the loans were made, Tobilar and Rimmer & Garrett ceased payment on their indebtedness. Ulysses J. Prevost, President of Rayne State Bank, learned from his colleagues in the banking industry *989 that Tobilar and Rimmer & Garrett were experiencing severe financial difficulties, with the possibility of bankruptcies looming ahead. With the advice from his peers weighing on his mind, Mr. Prevost decided to consult an expert on mortgages and bankruptcy to review the documentation on the loans. He called a New Orleans attorney, Mr. Edward Heller, who specialized in advising banks and other creditors in the event of borrower bankruptcies, and set up an appointment to have the documents prepared by Chambers reviewed for defects.
Mr. Prevost and Mr. Heller met for one to one and one-half hours in March of 1980 in Heller's office. All of the parties agree that Heller was hired solely for the purpose of rendering an opinion on the documents, and was not expected to perform any necessary corrective work. This one consultation of an hour and a half or less was Heller's sole contact with Mr. Prevost. As is usual in consulting work, Heller advised Prevost only on the status of the documents; Prevost received his bill for $125.00, and no follow-up work was requested or or performed by Heller.
The content of this meeting is disputed. Although both Heller and Prevost agree that minor defects, including defects in the corporate resolutions, were discussed in the short time they spent together, Prevost insists that no mention was made of the omission of the location of the chattels in the mortgages. Heller insists that he discussed the omission of this information with Prevost, and advised him of the resultant possibility of the invalidation of the mortgages as to the chattels.
Heller states that all of the defects in the documents were discussed, and that an extensive conversation took place regarding the advisability of undertaking the correction of the defects, since any notice of a possibly fatal flaw to the debtors could precipitate the attempt to invalidate the mortgages in bankruptcy court. Heller urges that he gave Prevost advice on all courses of action, and that Prevost left the office without making the decision to undertake corrective work on the major defects, which would necessitate the participation of the debtors.
The only written record of this informal meeting was contained in notes taken by Mr. Prevost, which he was unable to produce at trial. Mr. Prevost, a layman, testified that the reason he took notes at this meeting was because the advice Mr. Heller gave was "too complicated" for him to remember.
According to Prevost, on his return home to Rayne, he called Mr. Chambers, the borrower's attorney, and told him to call Mr. Heller to find out what was necessary to correct the documents. Chambers did call Heller, and both agree that neither mentioned the omission of the location of the chattels in the mortgages.
According to Heller, he received a brief phone call from Chambers during which Chambers read certain corrections of minor defects which he had drafted, which Heller agreed were acceptable after making a few changes. Heller testified that he did not feel that it would have been proper for him to divulge to the borrower's attorney that major defects existed in the documents without knowing whether Prevost had decided to keep the matter secret or not. He testified that Chambers called for assistance only in relation to the minor defects, and did not ask for any further help. After this phone call Chambers prepared acts of correction to remedy the minor defects, which the principals of the corporations signed.
In November of 1980, however, the principals of Tobilar and Rimmer & Garrett appeared at the bank with new counsel. They informed the bank that the mortgages were defective, and threatened to file for bankruptcy and seek invalidation of the mortgages in bankruptcy court if the bank refused to lend them an additional $150,000. The bank refused to lend them the money.
Rayne State Bank initiated foreclosure proceedings on the mortgages in January of 1981. Tobilar and Rimmer & Garrett filed bankruptcy proceedings under Chapter 11 of the Bankruptcy Code in the United *990 States Bankruptcy Court for the Western District of Louisiana on January 20, 1981.[5]
On January 27, 1981 Tobilar and Rimmer & Garrett, as court appointed debtors in possession, filed adversary proceedings against Rayne State Bank to invalidate the mortgages insofar as they related to movable property.[6] Tobilar and Rimmer & Garrett asserted that the mortgages were invalid on several grounds, including the failure of the mortgages to designate the location of the chattels as required by R.S. 9:5352.
On April 28, 1981 Rayne State Bank filed third party complaints in the bankruptcy court against the present defendants.
Settlement negotiations were entered into between Rayne State Bank and the debtors in possession, and the present defendants urged the bank to accept the debtors' offer under its duty to mitigate any possible damages. Rayne State Bank settled the case with the debtors in October of 1981, agreeing to cancel the mortgages on certain chattels in exchange for a stipulation by the debtors recognizing the validity of the mortgages as to the remainder of the chattels. This stipulation was incorporated into the judgment of the bankruptcy court, thus precluding a determination on the merits that the mortgages were invalid because of the defects. The bank alleges that it lost $207,421.55 of the debt owed by Tobilar and Rimmer & Garrett in settling the claim, and incurred losses from the loss of use of its collateral and loss of the right to participate as an unsecured creditor, plus attorney's fees, for a total cost of $372,060.00 as a result of the omission of the location of the chattels from the mortgages.
The judgment of the bankruptcy court approving the settlement specifically reserved the bank's rights to proceed against the present defendants in bankruptcy court. That suit remained pending when the instant suit was filed on March 24, 1982.
Rayne State Bank alleges that Noble Chambers is responsible for the monetary damage it suffered because of the defective mortgages, basing its complaint against him on his alleged negligence in preparing the mortgages in disregard of the Chattel Mortgage Act, R.S. 9:5351 et seq., and on his breach of an alleged warranty of his work contained in the title opinions he rendered. The complaint against Heller is based on his alleged negligence in failing to inform Prevost of the defects in the mortgages so that corrective work could be undertaken. The complaint also joined Chambers' law firm, Aaron, Aaron & Chambers, Heller's law firm, Bronfin, Heller, Feldman & Steinburg and National Union Fire Insurance Company, the legal malpractice insurer for both firms, and alleged that all defendants were liable in solido to the bank for the sum of $372,060.00.
All of the defendants answered the complaint and all filed peremptory exceptions of prescription. After a full hearing on the merits, the district judge sustained the exception of prescription of each defendant. The judge held that the one year prescriptive period for delictual actions applied since plaintiff's claim was based solely in tort. The district judge specifically found as a matter of fact that Heller did inform Prevost at the March 1980 meeting that the mortgages were defective because of their failure to state the location of the movable property involved. The court held that this notice of the defects in the mortgages was sufficient to start the one year prescriptive period. Noting that more than one year had elapsed between the date of the meeting in March of 1980 and the date on which Rayne State Bank filed third party complaints against the defendants in bankruptcy court on April 28, 1981, the judge held *991 that the bank's suit was barred by the running of the prescriptive period of one year.
The court of appeal affirmed the decision of the trial court sustaining Chambers' peremptory exception of prescription. The court of appeal determined, in affirming the district court's factual finding that Heller had informed Prevost of all the defects in the mortgages, that Heller was not liable, and accordingly dismissed plaintiff's suit against Heller on the merits, rather than affirming the district court's sustaining of Heller's peremptory exception of prescription.
Rayne State Bank argues before this court that the court of appeal erred in affirming the factual finding of the district court that Heller informed Prevost of the defects in the mortgages, because this decision was clearly erroneous, and argues that in affirming this factual finding the court of appeal violated the standards for appellate review. The bank also argues that the court of appeal erred in dismissing Heller from the case on affirming this factual finding, since there were other grounds on which to base Heller's liability.
Rayne State Bank also urges that the court of appeal erred in determining that prescription began to run on the claim against Chambers on the date of the meeting between Heller and Prevost, even assuming that Heller informed Prevost of all the defects, since no damage had yet occurred to the bank on this date. Furthermore, the bank urges that the court of appeal erred in applying the one year prescriptive period applicable to actions ex delicto, arguing that the ten year prescriptive period for actions ex contractu should apply because Chambers expressly warranted the legal effect of his work in his title opinion letters to the bank.

I. HELLER'S LIABILITY
Because the ultimate determination that the prescriptive period on the bank's claim had run was based on the factual finding by the lower courts that Heller gave Prevost notice of the possibly fatal defects in the mortgages in March of 1980, this issue and the related dismissal of the bank's claim against Mr. Heller will be considered first.
The bank argues that the trial court's factual finding regarding the content of the meeting between Heller and Prevost was clearly wrong, and that the court of appeal applied an improper standard of review under Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), in affirming this finding.
The court of appeal correctly pointed out that this issue presents a "garden variety evidentiary dilemma" wherein two interested parties' versions of the facts conflict. In such a case "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review." Canter v. Koehring, 283 So.2d 716, 724 (La.1973).
Rayne State Bank argues that the only interested party was Heller, who has a direct, pecuniary interest as well as his reputation at stake. However, as the court of appeal correctly pointed out, Prevost, as President of Rayne State Bank, also has an interest in the outcome of this case. The court of appeal's classification of this dispute as a matter for a credibility determination is correct. The bank argues that there is other corroborating evidence supporting Mr. Prevost's version of the meeting. However, a review of the record shows that any faint corroborating evidence which may be present can be interpreted to support either party's version of the meeting, depending on which witness is believed.
The trial judge had the opportunity to observe both witnesses in this case, and concluded that Mr. Heller's version of the meeting was correct. The court of appeal held that "the factual determination of the trial court is not clearly wrong (manifestly erroneous)." 469 So.2d at 413. That finding is correct. The district court's finding of fact on this issue is not contradicted by the preponderance of the evidence, as the bank alleges, and constitutes a reasonable *992 determination of fact based on an evaluation of credibility.
The court of appeal dismissed the case against Heller on the merits, rather than affirming the trial court's sustaining of Heller's exception of prescription. The only complaint against Heller in the plaintiff's petition was that he failed to inform Prevost of the major defects in the mortgages at the March 1980 meeting, and the court of appeal pointed out that the trial court's factual finding negated any liability alleged in the complaint.
Rayne State Bank argues that its legal malpractice claim against Heller, his law firm and their malpractice insurer should not have been dismissed on this basis, because the record establishes at least two other grounds for liability: first, that Heller breached his duty to advise Chambers of the major defects in the mortgages during the telephone conversation between them; second, that Heller breached his duty to advise Prevost of the possible loss of the bank's claim against Chambers, since Heller discussed the possibility of inaction on the part of the bank while the prescriptive period was running out.
The pleadings in this case do not contain these allegations. Nor does the testimony expand the pleadings to include further allegations of wrongdoing by Heller. These issues were not tried by express or implied consent of the parties, and thus cannot be considered as if they were raised by the pleadings under the exception in C.C.P. 1154. Accordingly, these issues are not properly considered on appeal.
Even assuming that these issues could be considered on appeal, the first contention, that Heller had a duty to inform the borrowers' attorney of the content of confidential information given to Heller's client, the bank, without authority from the bank, is totally without merit. Such a breach of Mr. Heller's duty of confidentiality to his client could have constituted an ethical violation. DR 4-101.
The second contention, that the bank was damaged because of Heller's failure to inform Prevost of the applicable prescriptive period on its claim against Chambers, is moot, since we find that Rayne State Bank's claim against Chambers is not barred by the running of prescription.
That portion of the decision of the court of appeal dismissing Rayne State Bank's legal malpractice suit against Mr. Heller, his law firm Bronfin, Heller, Feldman & Steinburg, and their malpractice insurer, National Union Fire Insurance Company, is affirmed.

II. CHAMBERS' EXCEPTION OF PRESCRIPTION
In upholding the defendants' exceptions of prescription, the district court held without discussion that prescription began to run in March of 1980, when the bank received notice of potentially fatal defects in the mortgages. One year had elapsed between this date and the filing of the bank's third party complaint against the present defendants in bankruptcy court, therefore the district court ruled for the defendants.
The court of appeal affirmed the district court's decision as to Chambers, stating that the bank was damaged when invalid security agreements were executed in January of 1980, and that prescription began to run when the bank received notice of the damage at the meeting between Heller and Prevost in March 1980.
The bank argues first that the one year prescriptive period applicable to delictual actions under C.C. 3536[7] had not elapsed at the time it filed third party complaints in bankruptcy court against the present defendants in April of 1981, since prescription did not commence to run until in January of 1981 when Tobilar and Rimmer & Garrett attempted to have the mortgages declared invalid in bankruptcy court, which was the first time the bank claims that it *993 sustained damage from the acts of the defendants.
Alternatively, the bank argues that the applicable prescriptive period in this case is the ten year period which governs contractual actions under C.C. 3544.[8] The bank bases this argument on the existence of purported express warranties of Chambers' work contained in two title opinion letters which he or a member of his firm sent to the bank.[9]

. . .
Because we find that plaintiff's suit is not barred by the running of the lesser prescriptive period of one year, the applicability of the ten year prescriptive period for contractual actions in this case is not an issue before this court.[10]
In determining that plaintiff's suit is not barred by the one year prescriptive period, the relevant inquiry concerns the date on which the prescriptive period began to run.
Again, the relevant dates and facts are as follows.
In January of 1979 Chambers drafted the allegedly fatally defective mortgages, which were executed by the debtors in favor of the bank the same month.
In March of 1980 the bank received notice of possibly fatal defects in the mortgages at the meeting between Heller and *994 Prevost. Corrective work was then undertaken by Chambers, who failed to correct the omission to state the location of the chattels, the possibly fatal defect.
In November of 1980 the principals of Tobilar and Rimmer & Garrett appeared at the bank, threatening to file for bankruptcy and to attempt to have the mortgages declared invalid in the bankruptcy proceedings.
In January of 1981 the bank instituted foreclosure proceedings by executory process against Tobilar and Rimmer & Garrett.
On January 20, 1981 Tobilar and Rimmer & Garrett filed for relief under Chapter 11 of the Bankruptcy Code. Then on January 27, 1981 Tobilar and Rimmer & Garrett, as court appointed debtors in possession with the avoidance powers of trustees in bankruptcy, filed adversary proceedings against the bank to have the mortgages declared invalid.
On April 28, 1981 the bank filed third party complaints against the present defendants in bankruptcy court alleging legal malpractice.
The bank felt that the mortgages would likely be declared invalid by the United States Bankruptcy Court for the Western District of Louisiana because of the precedent set by the United States Bankruptcy Court for the Middle District of Louisiana in I.C. Sand & Gravel Co., Inc. v. Bank of Gonzales, Case No. 80-00233, Adversary Proceeding No. 80-0078 (Bankr.M.D.La. 1980), which held that a chattel mortgage which failed to specify the location of the chattels was invalid. An unpublished opinion by the United States Fifth Circuit Court of Appeals, I.C. Sand & Gravel Co., Inc. v. Bank of Gonzales, 663 F.2d 104 (5th Cir. 1981), later affirmed this decision.
For this reason, and because the present defendants insisted that the bank take steps to mitigate any possible damages, the bank accepted a settlement offer from the debtors. The complaints filed by the debtors were settled on October 2, 1981, precluding a determination on the merits by the bankruptcy court that the mortgages were invalid.
The settlement agreement provided that the bank would cancel the mortgages over $207,421.55 worth of chattels and forego its right to participate as an unsecured creditor in exchange for a stipulation by the debtors that the mortgages were valid as to the remaining chattels. The bank argues that its total losses caused by the defendants because of the defects in the mortgages equal $372,060.00. The bank argues that it was the existence of these defects which caused Tobilar and Rimmer & Garrett to attack the mortgages in bankruptcy court, and caused the bank to compromise in settlement.
Thus, while the mortgages were not declared invalid, the bank argues that it did suffer damage as a result of the failure of the mortgages to comply with R.S. 9:5332, and the resulting attempt at invalidation of the mortgages in bankruptcy court which the bank was forced to defend.
The judgment of the bankruptcy court approving the settlement agreement specifically reserved the bank's rights to proceed against the present defendants in bankruptcy court. That suit remained pending as of the date the instant suit was filed on March 28, 1982.
In upholding the defendants' exceptions of prescription, the district court held without discussion that prescription began to run in March of 1980, when the bank received notice of potentially fatal defects in the mortgages. One year had elapsed between this date and the filing of the bank's third party complaint against the present defendants in bankruptcy court, and so the district court ruled for the defendants, holding that C.C. 3536 applied because plaintiff's claim was based "solely in tort."
The court of appeal affirmed the district court's decision as to Chambers, stating that the bank was damaged when invalid security agreements were executed in January of 1980, and that prescription began to run when the bank received notice of the damage at the meeting in 1980.
*995 The court of appeal apparently based its decision on the assumption that the mortgages were invalid because of noncompliance with the statutory requirement that the location of the chattels must be stated. R.S. 9:5352. The court stated that "Rayne State Bank was damaged when it made a loan which it thought was secured when in fact it was not." 469 So.2d at 416. This conclusion was reached without consideration of this issue on the merits.
In the adversary proceedings in the bankruptcy court filed by the debtors, the debtors' authority for their argument that the mortgages were invalid for failure to state the location of the chattels was a bankruptcy court opinion, which was later affirmed by an unpublished opinion of the United States Fifth Circuit Court of Appeals, supra. That decision by the Fifth Circuit (that the failure to state the location of the chattels renders a mortgage void ab initio) was rendered without consideration of the remedial or retroactive effect of the September 1981 amendment to R.S. 9:5352 which added the sentence that "the failure to recite the location of the chattel shall not affect the validity of the mortgage."
Louisiana courts have liberally construed the descriptive and locational requirements of R.S. 9:5352 to necessitate only identification specific enough to apprise third parties of the existence of a mortgage on the property.[11] This determination depends on the circumstances of each individual case. The issue is a matter for judicial determination, and since no court has made such a determination in this case, nor considered the possibly remedial effects of the amendment to R.S. 9:5352, the conclusion by the court of appeal that the mortgages were invalid ab initio is unsupported.
Since the mortgages were not necessarily invalid, and had never been declared invalid, it cannot be concluded that Rayne State Bank was damaged by making loans which were not secured at the time the mortgages were executed. Since no damage was conclusively sustained at that time, the court of appeal's conclusion that notice to the bank that Chambers drafted defective mortgages began the running of the prescriptive period under Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285 (1970) is erroneous.
In Louisiana prescription does not begin to run until damage is sustained. The tort prescription provisions in former C.C. 3537 were reenacted without substantive change in 1984 as C.C. 3492. C.C. 3537 provided that the one year prescriptive period for delictual actions runs "from [the day] on which the injurious words, disturbance, or damage were sustained."
Mere notice of a wrongful act will not suffice to commence the running of the prescriptive period. The reason is clear. In order for the prescriptive period to commence, the plaintiff must be able to state a cause of actionboth a wrongful act and resultant damages. Because the damage must necessarily occur after the wrongful act, prescription runs from that point and not from the date of the wrongful act. See Owens v. Martin, 449 So.2d 448 (La.1984), reaffirming Jones v. Texas & Pacific Ry. Co., 125 La. 542, 51 So. 582 (1910). Thus, until damage was "sustained" by the bank, it had no cause of action, and prescription did not commence to run on the date the bank received notice of possibly fatal defects in the mortgages.
Damage was not sustained by the bank by virtue of the mere existence of defects in the mortgages. At this point, the possibility of damage to the bank was merely speculative, uncertain and contingent on the possibility of an attack on the validity of the mortgages by a third party, or on the possibility that the debtors would declare bankruptcy. In the event that neither of these contingencies occurred, and the debtors continued payment of their indebtedness, no harm at all would have resulted to the bank. The defects in the *996 mortgages did not affect the principal obligations between the bank and the debtors; the debtors themselves could not have sought to avoid their obligations on the basis that the security agreement was defective. Such security agreements are basically devised to protect creditors against the claims of third parties; thus only where a third party attacks the validity of a security agreement does damage materialize.
Until the debtors in possession, who were vested with the avoidance powers of a trustee in bankruptcy[12] thus becoming in effect third parties to the loans, attacked the mortgages and sought to have them declared invalid, the possibility of damage to the bank resulting from the defects in the mortgages was speculative, not capable of ascertainment, and certainly not susceptible of proof in a court of law. As this court stated in Jones v. Texas & Pacific Ry. Co., supra at 583:
"A damage can be considered to have been sustained, within the meaning of article 3537, supra, only when it has manifested itself with sufficient certainty to be suceptible of proof in a court of justice."
In Jones, the plaintiff's mule was struck by a passing train, sustaining a flesh wound. Two months later the mule died. The plaintiff brought suit within a year from the death of the mule, but over a year from the time of the accident. This court noted that:
"... Until by the death of the mule the damage had been revealed, or, ... been made certain, plaintiff had no cause of action for it. Until then, it was at best uncertain, contingent, speculative; and nothing is better settled in the law of damages than that a damage of that character does not give rise to a cause of action...." Id.
In this case damage to the bank arising from the defective mortgages was not susceptible of ascertainment until the validity of the mortgages was attacked. Although the full extent of the damage was not yet known at that time, the fact that some damage would occur was known, since the bank had to defend against the attack.
"... in order that prescription should run, it is not required that the loss should have been already suffered, but only that the fact that it is going to be suffered, or is sure to result, should be sufficiently certain to serve as a basis for a claim of damages in court." Jones v. Texas & Pacific Ry. Co., supra at 583.
Regardless of the actual validity or invalidity of the mortgages, the debtors in possession attacked them in the adversary proceedings in bankruptcy court because of the existence of the defects, and Rayne State Bank settled the claim against it because of the fear of the total invalidation of the mortgage caused by the existence of the defects. This attack, which Rayne State Bank was forced to defend, was direct damage to the bank resulting from the existence of the defects, regardless of any future determination of further damage resulting from invalidity of the mortgages. It is from the date of this damage that damage was "sustained" in the meaning of C.C. 3537 (new C.C. 3492).
This determination that "damage was sustained" is of course not a determination on the merits that damage was indeed sustained by the bank due to any negligence on the part of Mr. Chambers. It is simply a determination that plaintiff sustained damage sufficient to support accrual of a cause of action against the defendants, and it is from this point that the prescriptive period begins to run. The determination whether Mr. Chambers was negligent and whether this negligence caused the damage complained of, as well as the extent of any such damage, is a matter to be determined on the merits.
Accordingly, this court finds that the prescriptive period commenced to run on *997 Rayne State Bank's legal malpractice action against Chambers on January 27, 1981, the date that adversary proceedings were filed in the bankruptcy court by Tobilar and Rimmer & Garrett. Since Rayne State Bank filed third party claims against Chambers, his law firm Aaron, Aaron & Chambers, and National Union Fire Insurance Company on April 28, 1981 in bankruptcy court, interrupting the prescriptive period, the bank's present action filed in March of 1982 is not barred by the running of the one year prescriptive period.
For the foregoing reasons, the decision of the court of appeal dismissing the suit against Edward Heller, his law firm, Bronfin, Heller, Feldman & Steinburg, and their insurer, National Union Fire Insurance Company, on the merits is affirmed at plaintiff's cost. The decision of the court of appeal sustaining the peremptory exceptions of prescription filed by Noble Chambers, Aaron, Aaron & Chambers, and their insurer, National Union Fire Insurance Company, is reversed, and the case is remanded for a determination of the merits of Rayne State Bank and Trust Company's legal malpractice claim against them, the allocation of costs to await the outcome of that litigation.
LEMMON, J., concurs.
MARCUS, J., concurs in part and dissents in part and assigns reasons.
WATSON, J., concurs in part and dissents in part with reasons.
WATSON, Justice, concurring in part and dissenting in part.
While I concur with the majority as to the exception of prescription on behalf of Chambers, I dissent on the issue of Heller's possible liability.
After an informal examination at the Rayne State Bank, it was suggested that documentation on the loans in question should receive expert scrutiny by Edward Heller. After a conference between the bank president, Ulysses J. Prevost, Sr., and Heller in New Orleans, Prevost returned to Rayne. He "made arrangements for Noble Chambers to call him [Heller] when I got back to get from him exactly what he wanted to correct in the documentation."[1] Because "[i]t was too complicated for me to carry back and relate to Noble Chambers,... I had Noble call him direct."[2] Prevost's instruction to Chambers was to do whatever "needed to be done."[3] When Chambers called Heller, he was acting on behalf of the Rayne State Bank, rather than his original clients.
According to Heller, he told Prevost, a layman, about at least three problems in the collateral mortgage documentation, including one with the corporate resolutions. Heller admitted that Prevost had indicated the debtors would probably be cooperative in the matter.[4] Heller did not give Rayne State Bank a written notation or letter about his findings and has no file or memoranda about his one hour conference with Prevost.[5]
When Chambers called Heller it should have been clear to Heller that Prevost was attempting to get the mortgages corrected. Chambers told Heller on the telephone that Prevost had instructed Chambers to call. Chambers wanted to find out what Heller considered necessary to get the mortgages corrected. Since Chambers called on behalf of the Rayne State Bank at Prevost's direction, Heller should have divulged the substance of his conversation with Prevost. He admittedly did not do so. Although Heller had noted problems in at least three areas, his conversation with Chambers only *998 covered deficiencies in the corporate resolutions. Heller frankly admitted that he was very busy at the time.
Chambers' two corporate clients did not quibble at all about signing the corrected corporate resolutions. At that time, the relationship between the parties was entirely amicable. The corporate officers were very cooperative because they thought their companies were going to "make it.... And Rayne State Bank had just gotten them a moratorium on the Farmer's Home Loan."[6]
The majority indicates that Heller deliberately withheld from Chambers confidential information which he had previously given to Prevost verbally, but Heller did not take that position. According to Heller, there was no discussion with Chambers as to the location of the chattels or completeness of the descriptions simply because: "None of these [matters] came up."[7] Heller said: "I don't know what was in my mind at the time I talked to him. And it was quite a time after the visit from Mr. Prevost, but I think I probably did remember there were other problems. I didn't think it was my business to inquire about what the bank was doing to correct them."[8]
The trial court made a factual finding that: "Edward Heller informed U.J. Prevost at the March, 1980, meeting that the mortgages were defective due to failure to state the location of the immovable property involved."[9] However, this does not dispose of the issue of Heller's liability. Accepting the trial court's credibility determination, the fact remains that Heller was talking to a lay person about technical and complicated questions and had been engaged as an expert by the Rayne State Bank. All Prevost gleaned from the conversation was that certain corrective work needed to be done and he had Noble Chambers contact Heller on behalf of the bank to determine exactly what was necessary. According to his own admission, Heller was very busy at the time, did not recall much of the substance of the conversation, but admitted that the location of the chattels was not mentioned to Chambers. Heller knew that Chambers was calling at the behest of Prevost and had a duty to followup on his prior conference by making a full disclosure to Chambers.
The majority states:
"The only complaint against Heller in the plaintiff's petition was that he failed to inform Prevost of the major defects in the mortgages at the March, 1980, meeting,..."
Rayne, in its original petition, alleged:
"The deficiencies in the aforementioned mortgages were not called to the attention of Rayne State Bank and Trust Company by Mr. Edward Heller at the time of his review of the documents, at which time Rayne State Bank could have obtained Acts of Correction from its borrowers, and, as a consequence, Mr. Edward Heller, and the law firm of Bronfin, Heller, Feldman & Steinburg, are liable to Rayne State Bank and Trust Company for its losses herein." (Tr. 7)
Rayne's allegations in regard to Heller are not quite as narrow as the majority indicates. Moreover, the pleadings were enlarged by extensive testimony regarding the telephone conversation between Chambers and Heller.
If Heller had made a deliberate decision not to disclose to Chambers the chattel location problem, he should at that point have made some written communication to the bank to clarify his advice. Failing to either tell Chambers of the problem or to make a written disclosure to the bank, he neglected the precise task for which he had been employed, which was to point out any defects in the mortgages. Regardless of the content of the meeting between Prevost and Heller, which only confused Prevost, Heller had a duty to explicitly divulge *999 to Chambers and/or Rayne State Bank exactly what the deficiencies were in the mortgages. Therefore, the majority errs in dismissing the bank's claim against Heller.
I respectfully dissent as to dismissal of the suit against Heller, his law firm, and its insurer, although I concur as to the exception of prescription by Chambers.
MARCUS, Justice (concurring in part and dissenting in part).
I agree with the majority's dismissal of the legal malpractice suit against Mr. Heller. However, I consider that the bank sustained damage when it received notice of the possibly fatal defects in the mortgages in the meeting between Heller and Prevost in March of 1980; hence, prescription on the legal malpractice claim against Mr. Chambers commenced to run at that time. Accordingly, I would sustain the exception of prescription filed by Mr. Chambers.
I respectfully concur in part and dissent in part.
NOTES
[1] Rayne State Bank & Trust Co. v. National Union Fire Insurance Co., 469 So.2d 409 (La. App.3d Cir.1985), writ granted 475 So.2d 346 (La.1985).
[2] Tobilar, Inc. and Rimmer & Garrett, Inc. were two general road construction companies whose officers and directors were Thomas Garrett, Larry Garrett and William Marsh.
[3] Prior to amendment in 1981, R.S. 9:5352 stated that "a full description of the property to be mortgaged shall be set forth so that it may be identified and its location shall be stated."

The legislature amended this section by Acts 1981, No. 306, § 1, adding the following clause to the text above: "provided, that the failure to recite the location of the chattel shall not affect the validity of the mortgage."
[4] No considered judicial determination has been rendered on the merits by any court in this matter that the mortgages were invalid, as will be discussed in greater detail.
[5] In re Tobilar, Inc., No. 481-00034-LO (Bankr. W.D.La.1981); In re Rimmer & Garrett, Inc., No. 481-00035-LO (Bankr.W.D.La.1981).
[6] In re Tobilar, Inc. v. Rayne State Bank and Trust Company, Adversary No. 481-0009 (Bankr.W.D.La.1981); In re Rimmer & Garrett, Inc. v. Rayne State Bank and Trust Company, Adversary No. 481-0008 (Bankr.W.D.La.1981).
[7] Prior to the amendment and reenactment of Title XXIV of Book III of the Civil Code effective January 1, 1984, C.C. 3536 governed the prescriptive period for delicts. The new article, C.C. 3492, which replaced both C.C. 3536 and 3537, does not change the law.
[8] Prior to 1984, the prescriptive period for actions in contract was governed by C.C. 3544. The new article, C.C. 3499, reproduces the substance of C.C. 3544 without changing the law.
[9] The following is an abstract of one of the title opinion letters which Chambers sent to the bank:

"Rayne State Bank & Trust Company
200 South Adams Avenue
Rayne, Louisiana 70578
Re: Title to TRACT 1 (description of tract 1)
TRACT 2 (description of tract 2)
Gentlemen:
Pursuant to your request, we have examined the title to the hereinabove described tracts of land, our examination having been conducted from the public records of the Parish of Acadia, Louisiana, and from our examination we find that Rimmer & Garrett, Inc., is vested with good, valid and merchantable title in and to the hereinabove described property, subject to the following comments and criticisms: (emphasis added)
1.
The mineral rights ...
2.
Both properties are subject to several utility easements ...
MORTGAGES, LIENS AND ENCUMBRANCES
1.
There is a special mortgage in the principal sum of $700,000.00 ...
2.
There is a special mortgage with chattel dated January 22, 1979, drawn in the principal sum of $1,000,000.00, made payable at Rayne State Bank & Trust Company, Rayne, Louisiana, filed for record on January 23, 1979, under Original Entry No. 454347, which mortgage affects tracts 1 and 2 described above, together with certain chattels included therein. (Emphasis added).
. . . . . .
. . . . . .
Except as mentioned herein, there are no other mortgages, liens or encumbrances affecting the hereinabove described properties as of the date and time this title opinion is signed.
This title opinion is granted to you solely for the purpose of advancing funds against the $1,000,000.00 mortgage dated January 22, 1979, identified above.
. . .
 Respectfully submitted,
 Aaron, Aaron & Chambers
 By: s/ Noble M. Chambers
 Noble M. Chambers, Jr."

[10] Rayne State Bank contends that the title opinion letters issued by Chambers to the bank contain language expressly warranting the legal effect of the mortgages as to the chattels involved, and that accordingly the action may be deemed contractual as well as delictual, supporting the applicability of the ten year prescriptive period for contractual actions.

The letters did not contain an express warranty of the validity of the mortgages as they related to the chattels. Chambers, lawyer for the borrowers, gave the title opinions to the bank to assure them that Tobilar and Rimmer & Garrett held good and merchantable title to the immovable property covered by the mortgages. The title opinions were dated January 23, 1979 and received by the bank after the funds had been disbursed. The letters detailed the tracts of land in question, noting all mortgages, liens and encumbrances, and mentioning in passing that the bank's mortgages affected the pertinent tracts of land "together with certain chattels included therein." This reference did not constitute a warranty of the validity of the mortgages as to the chattels.
Since Rayne State Bank's legal malpractice action is based solely on the alleged negligence of Mr. Chambers in drafting defective mortgages, the decision of the court of appeal that the one year prescriptive period for delictual actions must apply is correct.
[11] See, e.g. Smith v. Bratsos, 202 La. 493, 12 So.2d 245 (1942); Union Bldg. Corp. v. Burmeister, 186 La. 1027, 173 So. 752 (1937); Young v. Squeeze Tools, Inc., 350 So.2d 967 (La.App.2d Cir.1977); McGuffin v. Barkett, 44 So.2d 195 (La.App.2d Cir.1950).
[12] 11 U.S.C. § 1107(a) vests those appointed debtors in possession with the powers and duties of trustees. Under 11 U.S.C. § 544, et seq. trustees in bankruptcy have the power and the duty to set aside any invalid security agreements for the benefit of the estate and the unsecured creditors.
[1] Tr. 774.
[2] Tr. 786.
[3] Tr. 775.
[4] Heller said in deposition: "Now we didn't get into whether he should go to them [the creditors] about one thing and not the others. We just talked about whether he should go to them or not go to them." (Tr. 51)
[5] Heller's bill of $125 for one hour, dated April 3, 1980, covered "Rimmer & Garrett, Inc. and Tobliar, Inc., professional services in connection with review of collateral." (Tr. 43)
[6] Tr. 861.
[7] Tr. 834.
[8] Tr. 847.
[9] Tr. 752.