565 So.2d 990 (1990)
SUCCESSION OF Bilwood SMITH
v.
KAVANAUGH, PIERSON AND TALLEY, et al.
No. 89 CA 0668.
Court of Appeal of Louisiana, First Circuit.
June 26, 1990.
Writ Denied October 19, 1990.
*991 John S. White, Baton Rouge, for plaintiff-appellant Earline Jo Jennings Smith, individually and as executrix of the succession of Bilwood Smith.
Paul Spaht, Baton Rouge, for defendant-appellee Joseph H. Kavanaugh, James F. Pierson, Ray W. Talley, Marshall B. Brinkley, Kavanaugh, Pierson & Talley Kavanaugh & Brinkley and New England Insurance Co.
David Ellison, Jr., Baton Rouge, for defendant-appellee James F. Pierson, Jr. J.H. Kavanaugh.
Charles Schutte, Jr., Baton Rouge, for defendant-appellee Aetna Cas. & Surety Co.
Stephen Wilson, Baton Rouge, for defendant-appellee CNA Ins. Companies.
John Combe, Jr., New Orleans, for defendant-appellee Travelers Ins. Co.
Marc Judice, Lafayette, for defendant-appellee Nat. Union Fire Ins. Co.
Michael Colvin, Baton Rouge, for defendant-appellee U.S. Fire Ins. Co.
Justin Ourso, III, New Orleans, for defendant-appellee Appalachain Ins. Co.
Donald Zuber, Baton Rouge, for defendant-appellee St. Paul Fire & Marine Ins.
Jerry A.H. Flynn, Baton Rouge, for defendant-appellee Marshall B. Brinkley.
Before CARTER, SAVOIE and ALFORD, JJ.
SAVOIE, Judge.
This is an action for legal malpractice. Plaintiff, Earline Jo Jennings Smith, individually and as the executrix of the Succession of Bilwood Smith filed suit against Joseph H. Kavanaugh, James F. Pierson, Jr., Roy W. Talley and Marshall B. Brinkley as individual attorneys, as well as the various partnerships which the defendant attorneys created between themselves and their liability insurers. She alleged the defendants committed various acts of malpractice while employed as attorneys for the succession.
Defendants filed an exception of prescription which was heard by the trial court during a three day period in April of 1988. After taking the matter under advisement, *992 the court issued written reasons for judgment sustaining the exception. Plaintiff has appealed the adverse judgment asserting three assignments of error.

FACTS
The record in this matter reflects the following. Mrs. Smith's husband, Bilwood Smith, died on August 10, 1968. Mrs. Smith was then twenty-nine years old. She had four children, ages 2, 3, 5 and 7 and was pregnant with her fifth child. She was not actively involved in the extensive business and banking affairs of her husband prior to his death.
Defendants, who were friends of her late husband, represented the succession as its attorneys. This was done with her consent. On August 16, 1968, Mrs. Smith was confirmed as executrix of the succession and on August 29, 1968, she was appointed provisional administrator. She was then instantly thrust into the complicated financial dealings of her late husband.
Mrs. Smith testified that she wanted to know as much about the affairs of her husband as she could possibly learn. She conversed with her attorneys often, possibly several times a week. When she received letters or pleadings that she did not understand, she would always ask somebody to explain them. However, she also testified that she relied on her attorneys one hundred percent and trusted their judgment in succession matters.
As provisional administratrix she wrote numerous checks on the succession account, lending hundreds of thousands of dollars to Mark C. Smith & Sons, Inc. (MCS, Inc.). MCS, Inc. was a real estate development company owned by her late husband, Mark C. Smith, Jr., her father-in-law and Mark C. Smith, III, her brother-in-law. She identified her signature on a document showing she was the vice-president of MCS, Inc. Shortly after the succession lent the money, MCS, Inc. declared bankruptcy.
The depletion of the succession's cash caused numerous problems. Unable to make payments on notes from numerous other business dealings, the succession was required to execute forced sales of many properties and other properties were lost to foreclosure.
On December 4, 1970, she filed a renunciation of the succession after having been advised by her attorneys that the succession contained more debts than assets.
On June 20, 1973, the Succession of Bilwood Smith and others filed a suit entitled "Mark C. Smith & Sons, etc., et al. v. The Travelers Insurance Company et al." Mrs. Smith, as provisional administratrix, was represented in those proceedings by Henry Klein. The suit alleged the legal malpractice of Kavanaugh, Brinkley and Talley in failing to perfect an appeal of an adverse judgment of an earlier suit against the succession and others.
It appears that defendants continued to represent the succession past the date of the malpractice suit filed in 1973. In October of 1974 defendant Pierson filed a petition for ratification of acts and in December of 1974 a motion to amend a homologating order, both on behalf of Mrs. Smith as provisional administratrix.[1] The succession was never closed and no judgment of possession was ever signed.
A phone call from Lamar Advertising in 1982 asking Mrs. Smith if a sign could be erected on one of the succession properties which had been sold, piqued Mrs. Smith's curiosity about the property. In October of 1982 she asked defendant Pierson for her files. He delivered the succession files in his possession and she also received some files from defendant Kavanaugh's wife. She never returned the files to the defendants. She testified she just wanted to understand what had happened with the various transactions in the succession.
At some point after Mrs. Smith picked up the succession files, she visited the courthouse with a friend, ostensibly to find out who owned the tract of land about which Lamar Advertising had inquired. Notes *993 made on her friend's stationery refer to various succession properties but not the tract about which Lamar had inquired. Mrs. Smith testified she made the notes some time after she received the succession files and before she met David Smith.
Mrs. Smith met David Smith, an accountant and high school acquaintance, in February, 1984, at the National Food Store in Baton Rouge. She had bought an interest in the Marie Antoinette Hotel from the succession, and she claims that she first asked David Smith to look over her interest in that hotel. Within a week Mrs. Smith had gathered some papers on the Marie Antoinette which she brought to David Smith. David Smith's deposition related that within a day or so he returned the file to her and told her that she should consult an attorney.
At that point or perhaps earlier, Mrs. Smith had indicated that she had a large number of other files at her home. David Smith visited her home and observed the files that Mrs. Smith had obtained from Pierson and Kavanaugh.
David Smith started reviewing these files in February, 1984. One of the documents obtained was a personal, certified financial statement of Bilwood Smith dated December 31, 1967, showing a net worth in excess of three million dollars. David Smith was concerned that there were no annual accountings, no final accountings, and no fiduciary return for the full time period. David Smith felt that it was "imperative" that Mrs. Smith prepare an accounting and a final accounting and get it on record.
On February 28, 1984, Mrs. Smith and David Smith met with John White. Mrs. Smith testified that she visited with Mr. White at this time because she was interested in knowing whether she had an interest in the Marie Antoinette Hotel. There were a number of other questions asked of Mr. White.
Two of the documents in the files obtained from Mrs. Smith were the estate tax return and Bilwood Smith's certified financial statement showing a net worth in excess of three million dollars. When David Smith compared the tax returns to the financial statement, he was "incredulous" that certain figures were there.
In the weeks and months to follow, David Smith made an extensive investigation of the different assets in the succession by reviewing the files obtained from Pierson and Kavanaugh, reviewing the succession record, visiting courthouses, obtaining records from the Secretary of State, performing research, etc. As David Smith made his investigation, he would communicate back to Mrs. Smith to tell her what he had found and also to get additional information. David Smith also communicated with John White during his investigation.
Mrs. Smith testified that on August 10, 1984, she was first aware of the opinion of John White that defendants had committed legal malpractice causing damages to the succession. The original petition was filed on June 10, 1985.
Hearing of the exceptions of prescription was held on April 4-6, 1989, after which the trial court took the matter under advisement.
On November 14, 1988, the trial court gave Written Reasons for Judgment sustaining defendants' exceptions, which reasons were supplemented on January 9, 1989. On January 20, 1989, the trial court signed a judgment dismissing Mrs. Smith's suit with prejudice at her cost.

ASSIGNMENT OF ERROR NO. 1
Mrs. Smith's first argument is that the trial court erred in sustaining defendants' exception of prescription because an action for legal malpractice is imprescriptible. She argues this theory on two alternative grounds: (a) there is no express prescriptive period applicable to an action for legal malpractice; (b) if the one year prescription provided by LSA-C.C. art. 3492 is applicable to an action for legal malpractice, that article, as so applied, is an unconstitutional infringement upon the authority of the Supreme Court of Louisiana to regulate the practice of law.
Contrary to the assertion of Mrs. Smith we have previously ruled that normally a legal malpractice action will be subject to the one year prescriptive period *994 of LSA-C.C. art. 3492.[2] However, when an attorney expressly warranties a particular result or agrees to perform certain work and does nothing whatsoever then there would be an action in contract and the ten year prescription period of LSA-C.C. art. 3499 would apply.[3]Cherokee Restaurant, Inc. v. Pierson, 428 So.2d 995 (La.App. 1st Cir.), writ denied, 431 So.2d 773 (La.1983). See also Rayne State Bank & Trust Company v. National Union Fire Insurance Company, 483 So.2d 987 (La.1986). We therefore find that the first prong of her imprescriptibility argument has no merit.
Her second argument, that LSA-C.C. art. 3492 as applied to a legal malpractice action is an unconstitutional infringement upon the authority of the Supreme Court of Louisiana to regulate the practice of law, is based upon LSA-Const.Art. V, § 5(B) and LSA-Const.Art. II, §§ 1 and 2.
The authority of the Supreme Court of Louisiana to regulate the practice of law is constitutional, grounded on the grant of original exclusive jurisdiction of disciplinary proceedings against a member of the bar, LSA-Const.Art. V, § 5(B). It is also based on the constitutional division of state government into three separate branches legislative, executive and judicial, which establishes the basis for the recognition of inherent powers in the judicial branch that the legislative and executive branches cannot abridge, LSA-Const.Art. II, §§ 1 and 2.
Under the doctrine of inherent powers, courts have the power (other than those powers expressly enumerated in the constitution and the statutes) to do all things reasonably necessary for the exercise of their functions as courts. The doctrine is a corollary of the concepts of separation of powers and of judicial independence, in that other branches of government cannot, by denying resources or authority to the court, prevent the courts from carrying out their constitutional responsibilities as an independent branch of government. The inherent powers of the judiciary is a necessary concomitant to the judicial power, but pertains to the administration of the business of the court. (Citations Omitted).
Konrad v. Jefferson Parish Council, 520 So.2d 393, 397 (La.1988).[4]
LSA-C.C. art. 3492, as established by the legislature, is not unconstitutional as applied to legal malpractice actions. We hold that the establishment of the prescriptive period does not infringe, as applied in this case, upon the exclusive jurisdiction of the Supreme Court of Louisiana in attorney disciplinary matters. The legal malpractice action is not a disciplinary action; it is a civil suit directed against a member of the bar.
In addition, we hold the application of LSA-C.C. art. 3492 in this case does not infringe upon the inherent powers of the courts. The establishment of a prescriptive period by the legislature which applies to legal malpractice claims does not impede or frustrate the administration of the business of the court. We therefore find the first assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 2
Mrs. Smith's second assignment of error asserts that liberative prescription does not commence to run in a legal malpractice action until termination of the attorney-client relationship, which, she claims, occurred on June 10, 1985, the date the instant action was filed.
While a continuing attorney-client relationship may suspend the running of prescription, we hold the relationship between Mrs. Smith and defendant attorneys was terminated more than one year prior to her filing of this malpractice action.[5]
*995 Mrs. Smith argues that the doctrine of continuing representation operates to suspend the running of prescription until the withdrawing attorney has complied with the technical rules applicable to the withdrawal of representation by an attorney. She cites the Code of Professional Responsibility DR 2-110(A)(2), which was at the time incorporated into the Louisiana State Bar Association Articles of Incorporation, and had the effect of substantive law, as support for her assertion.[6] In addition, she relies on Rule X of the Civil Rules of the Nineteenth Judicial District Court. Both of these rules deal with the proper procedure for an attorney to withdraw from representing his client. Both rules require due notice be given to the client that the attorney is withdrawing from employment.
The "continuous representation" rule as used to suspend the running of prescription is actually a form of contra non valentem.[7]Olivier v. National Union Fire Insurance Co., 499 So.2d 1330 (La.App. 3rd Cir.1986); Blanchard v. Reeves, 469 So.2d 1165 (La. App. 5th Cir.), writ denied, 476 So.2d 347 (La.1985). The attorney's conduct, by continued representation, may induce the plaintiff-client to delay filing a legal malpractice suit. Therefore, the category of contra non valentem, wherein the debtor (defendant) himself has done some act effectually to prevent the creditor (plaintiff) from availing himself of his cause of action, is applicable to the situation. See Blanchard v. Reeves, 469 So.2d at 1168.
The issue of when the attorney-client relationship is considered terminated for purposes of the continuing representation rule has not been discussed in Louisiana. However, other states have ruled on the issue and we elect to borrow the statement made by the supreme court of South Dakota in Schoenrock v. Tappe, 419 N.W.2d 197 (S.D.1988).
[T]he continuous representation doctrine applies only to malpractice actions when `there is a clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney....' This relationship is one `which is not sporadic but developing and involves a continuity of the professional services from which the alleged malpractice stems.' Furthermore, the application of this doctrine should only be applied where the `professional's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship. (Citations omitted).
Schoenrock, 419 N.W.2d at 201.
We find that the above definition of the "continuous representation" rule aptly expresses our belief as to the applicability of the doctrine in legal malpractice actions. We feel the technical statutes cited by plaintiff do not solely control the disposition of the issue of continuous representation, but the entire relationship between attorney and client must be examined to determine the termination of representation.
The above considerations, which we find are indicative of a continuous attorney-client relationship, simply are not present in this case. The last document filed in the succession by defendant attorneys' was in December of 1974, some eleven years before Mrs. Smith claims the relationship ended. In addition, she actually removed most, if not all, of her files from defendants' offices in 1982, never to return them. We hold, therefore, that at the very latest, Mrs. Smith's relationship with the defendants terminated when she retrieved her files. There was simply no continuity in their contacts evincing a relationship past that date. Because we have determined the attorney-client relationship terminated well over one year prior to Mrs. *996 Smith filing the instant suit, this assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 3
Mrs. Smith's last assignment asserts that liberative prescription does not commence to run in a legal malpractice action until plaintiff is able to state a cause of action, which, she claims was on August 10, 1984.
In order to state a cause of action, a plaintiff must be able to allege a wrongful act and resultant damages. Prescription then runs from this point in time. Rayne State Bank & Trust v. National Union Fire Insurance Company, 483 So.2d at 995.
Mrs. Smith argues that she had no knowledge of defendants' wrongful acts or resultant damages until August 10, 1984 at which time she was informed by her current attorney of possible negligent acts committed by defendant attorneys in the handling of the succession.
The legal precepts involved in determining the outcome of this issue are set out in the Fourth Circuit case of Bellamy v. Janssen, 477 So.2d 928, 930 (La.App. 4th Cir. 1985), writ denied, 484 So.2d 667 (La.1986).
Although prescription does not begin to run until a plaintiff has knowledge of both the tort and the result in damages, i.e., until a cause of action has manifested itself with sufficient certainty to be capable of proof in a court of law, this doctrine applies only if a plaintiff's ignorance is not willful and does not result from his own negligence. Henderson v. Diamond Datsun, Inc., 413 So.2d 542 (La.App. 4th Cir.1982). It is not necessary that a party have actual knowledge of the conditions as long as there is `constructive notice' to excite his attention and put him on inquiry, which is tantamount to knowledge or notice of everything to which inquiry may lead and is sufficient to start the running of prescription. Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285 (1970); Sturm v. Zelden and Zelden, 445 So.2d 32 (La.App. 4th Cir.1984). In the absence of fraud or concealment, a plaintiff's mere ignorance of his rights will not toll the statute of limitations. Martin v. Mud Supply Company, 239 La. 616, 119 So.2d 484 (La.1960); Wingate v. National Union Fire Ins. Co., 435 So.2d 594 (La.App. 3rd Cir.1983), writ denied 440 So.2d 762 (La.1983).
As stated by Bellamy, ignorance of one's rights does not toll the statute of limitations. However, ignorance of the facts giving rise to a cause of action will toll the prescriptive period as long as such ignorance is not willful, negligent or unreasonable. Griffin v. Kinberger, 507 So.2d 821 (La.1987).
Here, the acts and omissions which allegedly constituted legal malpractice occurred during the defendants' representation of the succession as its attorneys. As we have previously discussed, the last document filed by defendants as succession attorneys was in December of 1974. We find, therefore, that the facts which give rise to the alleged malpractice existed in the 1970's. In addition, the damages to the succession were sustained during the late 1960's and 1970's. We find this to be the case because it was during this period of time when the succession was forced to sell many of its properties, lost others to foreclosure and ultimately was found to contain more liabilities than assets.
Having found that the facts giving rise to the alleged wrongful acts and resultant damages existed in the 1970's, we hold that the trial court was not manifestly erroneous in deciding that Mrs. Smith had knowledge of these facts during this same period of time.
Mrs. Smith, as the provisional administrator and eventually the administratrix of the succession, had the duty to collect, preserve and manage the property of the succession. LSA-C.C.P. art. 3191. Although she may have relied one hundred percent on the advice of her attorneys, she as provisional administrator and later administratrix was the one to carry out their advice. Her signature was required on the various documents which she claims caused the damages to the succession. She signed the succession checks to Mark C. Smith & *997 Sons, Inc. She signed the mortgages, notes, guaranties, and after the succession cash was depleted, she signed the forced sales and was served with foreclosure suits. We therefore find that the acts allegedly giving rise to the legal malpractice claim were known by her in the 1970's.
In 1982 she received the majority of the succession files from defendants. Included in those files was a certified financial statement of Bilwood Smith dated December 31, 1967, showing he then had a net worth of approximately three million dollars. She knew she had renounced the succession in 1970 because it contained more liabilities than assets. This disparity alone should have been sufficient to excite her attention.
In 1984, David Smith began looking into the succession to determine the ownership of some hotel stock. His inquiry expanded into various succession transactions. He kept Mrs. Smith informed as to his findings. He suggested that Mrs. Smith seek an attorney to unravel the ownership of the hotel stock. Mrs. Smith met with John White on February 28, 1984. In addition to the ownership of the hotel stock, they discussed the need to file other succession papers. Mrs. Smith claims she had no knowledge of defendants' malpractice until August 10, 1984, when John White informed her of the possibility.
We hold, however, that she had actual knowledge of the facts necessary to institute this action at some point prior to meeting with John White and after David Smith began looking into the various succession matters. It was during this period of time that Mrs. Smith had enough notice to excite her attention and put her on inquiry that the succession may have been handled improperly.
Although we do not pinpoint a specific date, we have stated that Mrs. Smith had knowledge of the facts sufficient to state a cause of action prior to February 28, 1984. Therefore, prescription began to run some time prior to February 28, 1984. Because this date is more than one year prior to the filing of the instant suit, this assignment of error has no merit.
For the above stated reasons, we affirm the trial court's sustaining of the peremptory exception of prescription. All costs are to be borne by appellants.
AFFIRMED.
NOTES
[1] The record shows Mrs. Smith's appointment as provisional administratrix was revoked on November 23, 1971 and she was appointed administratrix upon furnishing bond.
[2] Cherokee actually dealt with LSA-C.C. art. 3536 which was amended and redesignated LSA-C.C. art. 3492 without substantive change.
[3] Cherokee discussed the ten year prescriptive period of LSA-C.C. art. 3354 which has been amended and redesignated without substantive change as LSA-C.C. art. 3499.
[4] See Konrad, for examples of the use of inherent powers by the courts of Louisiana.
[5] For examples of the continuous representation rule as applied in Louisiana, see Blanchard v. Reeves, 469 So.2d 1165 (La.App. 5th Cir.), writ denied, 476 So.2d 347 (La.1985) and Olivier v. National Union Fire Insurance Co., 499 So.2d 1330 (La.App. 3rd Cir.1986).
[6] The Code of Professional Responsibility, in effect until January 1, 1987, was replaced by the Rules of Professional Conduct.
[7] For a thorough discussion of the doctrine of contra non valentem, see Corsey v. State Dept. of Corrections, 375 So.2d 1319 (La.1978).