892 So.2d 1261 (2005)
Brenda Sue CARTER, et ux.
v.
Gary Stephen HAYGOOD, DDS, et al.
No. 2004-C-0646.
Supreme Court of Louisiana.
January 19, 2005.
Rehearing Denied February 25, 2005.
*1262 Anne Elizabeth Watson, Sunset, Joseph Rodney Messina, New Orleans, for applicant.
Bolen, Parker & Brenner Ltd., James A. Bolen, Jr., Donna Johnson Duplechian, Alexandria, for respondent.
KNOLL, Justice.
This multi-issue dental medical malpractice case primarily addresses two prescription issues. The initial issue before us is whether the third category of the doctrine of contra non valentem can be invoked to suspend the prescriptive period under La.Rev.Stat. Ann. § 9:5628 when the plaintiff alleges continuing treatment coupled with defendant's alleged assurances to plaintiff that he could remedy her problem. The second question before us, which is complementary to the first issue, is whether the alleged medical malpractice victim's *1263 reliance on defendant's assurances was reasonable under the circumstances. Plaintiffs also raise whether the court of appeal erred in reversing the district court's determination that Dr. Gary Stephen Haygood breached the standard of care required of a dentist in his locale.
The district court denied the defendants' exception of prescription and further found defendant liable under La.Rev.Stat. Ann. § 9:2794. The court of appeal reversed in part and affirmed in part the district court's ruling on prescription and reversed the district court's finding of liability, rendering judgment in favor of the defendants. We granted this writ to review the correctness of the court of appeal's decision. Carter v. Haygood, 04-646 (La.5/14/04), 872 So.2d 527. For the following reasons we reverse, finding the court of appeal erred in concluding the plaintiffs' claims had prescribed and in reversing the trial court's determination of liability.

FACTS AND PROCEDURAL HISTORY
On June 25, 1996, plaintiff, Brenda Carter ("Mrs.Carter"), consulted defendant, Dr. Gary Stephen Haygood ("Dr.Haygood"), a dentist in Vidalia, Louisiana, about obtaining an estimate on replacing her partial dentures ("partials") she had received 22 years prior. During the exam, Mrs. Carter complained about gaps between her front and side teeth and an overbite. Mrs. Carter recalled Dr. Haygood stated to her that he could correct the overbite by pulling a couple of teeth in the back and bringing her teeth in; further, some tooth reduction may have been required for her overbite. According to Mrs. Carter's testimony at trial, Dr. Haygood did not perform a periodontal probe during this visit.
At a second appointment on July 11, 1996, Mrs. Carter had X rays taken of her teeth. After looking at the X rays, Dr. Haygood stated he thought he could pull a couple of teeth, pull back her teeth, and replace her bottom partials. Mrs. Carter agreed to have upper and lower partials made, and molds of her teeth were made. It was agreed Dr. Carter would extract a number of her teeth and fit her with top and bottom partials. Mrs. Carter testified she was never told she had gingivitis or pyorrhea and she was not probed by Dr. Haygood or his staff.
On August 30, 1996, Dr. Haygood extracted 11 teeth and then fitted plaintiff with metal-based, permanent partials made from impressions taken of her teeth at her previous visit. Mrs. Carter was not told 11 of her teeth were to be extracted. The medical records of Mrs. Carter indicate that on the date her teeth were extracted she had only 21 teeth in her mouth.
The partials did not fit properly and caused problems when plaintiff tried to eat or talk. Consequently, Mrs. Carter returned for adjustments several times.
Based on her continued complaints, Dr. Haygood replaced the metal partials with semi-permanent acrylic partials on September 12, 1996. These partials also required adjustments, and Mrs. Carter returned for those adjustments on September 30 and October 9, 1996. Dr. Haygood attempted to make the second set of partials fit better by grinding down some of her permanent teeth and some of the teeth in the partials.
On January 6, 1997, Dr. Haygood recommended plaintiff have her partials realigned at a cost of $150 per partial. The realigns were performed, but Mrs. Carter understood the price to be $150 for both partials. A dispute arose over the cost of the realigns, and plaintiff refused to pay for them. Later, Mrs. Carter's husband, plaintiff Charles Carter ("Mr.Carter"), *1264 called Dr. Haygood and told him they had already paid over $2,000 for the work performed, and they did not feel they should have to pay more for the realigns.
Although Mrs. Carter later tried to schedule appointments with Dr. Haygood for adjustments to her partials, he refused to see her and recommended she seek help elsewhere. Mrs. Carter eventually consulted a different dentist, Dr. James V. Iverstine ("Dr.Iverstine"), who treated her problems until the pain caused by the partials was resolved.
Dr. Haygood testified he did not perform a periodontal probe on Mrs. Carter because she had rampant decay and pyorrhea. Dr. Haygood also testified that Mrs. Carter wanted a "quick, cheap and in a hurry service" because she was going on a trip. Dr. Haygood testified he gave Mrs. Carter the option of having some of her 11 teeth filled, but she said she wanted her teeth removed. Dr. Haygood testified that he told Mrs. Carter how many teeth were to be pulled and the approximate cost of the extractions.
On December 18, 1997,[1] Mrs. Carter filed a medical malpractice complaint against Dr. Haygood with the Division of Administration based on his deviation from the normal standard of care. On March 3, 1999, the Medical Review Panel rendered an opinion, finding "the evidence does not support the conclusion that Dr. Gary Haygood failed to meet the applicable standard of care as charged in the complaint." The panel further reasoned:
Dr. Haygood properly discouraged Mrs. Carter from her request for dental plates and encouraged her to obtain partials. Because of her dissatisfaction with and complaints about the original partials he fitted her with acrylic partials at no cost to Mrs. Carter. At an appropriate time he relined the partials. Because of her continued dissatisfaction he made a referral to another dentist. The panel is of the opinion that the above services of Dr. Haygood were performed within the appropriate standard of care.
On April 28, 1999, the Carters filed suit against Dr. Haygood, the State of Louisiana Patient Compensation Fund, and ABC Insurance Company, seeking general, special, and loss of consortium damages based on the negligence of Dr. Haygood. They filed an amending and supplemental petition naming The Medical Protective Company, Dr. Haygood's malpractice insurer, as defendant. In his answer to the petition, Dr. Haygood requested a trial by jury. Upon the filing of a Dilatory Exception of Prematurity by the Patient's Compensation Fund, the Carters and the Fund filed a Joint Motion for Partial Dismissal, dismissing their suit against the fund without prejudice. Thereafter, on December 1, 1999, Dr. Haygood filed a Motion for Summary Judgment arguing the pleadings and attachments demonstrated there were no genuine issues of material fact. After a hearing on the motion, the district court denied the motion for summary judgment.
On July 6, 2000, Dr. Haygood filed a Second Motion for Summary Judgment. Following a hearing on the motion, the district court granted judgment in favor of Dr. Haygood and dismissed the Carters' claims with prejudice. A judgment was rendered on October 30, 2000. On November 7, 2000, the Carters filed a Motion for New Trial, alleging the district court erroneously granted the summary judgment in favor of Dr. Haygood. On January 31, 2001, the district court granted the motion in favor of the Carters. Dr. Haygood *1265 sought supervisory writs on this decision from the court of appeal, which denied the writ on May 14, 2001, finding no error in the district court's ruling. Carter v. Haygood, 01-367 (La.App. 3 Cir. 5/14/01) (unpublished). Although Dr. Haygood applied for writs to this Court, the application was not considered as it was not timely filed. Carter v. Haygood, 01-1763 (La.9/28/01), 797 So.2d 682.
Subsequently, the plaintiffs filed a Motion to Convert Jury Trial to Bench Trial, arguing their damages did not exceed the $50,000 jury trial jurisdictional amount. Thus, the matter was converted to a bench trial. Dr. Haygood then filed a peremptory exception of prescription.
The hearing on the exception of prescription was held prior to the start of trial on the merits on November 20, 2001. Dr. Haygood argued the Carters' claims had prescribed since Mrs. Carter filed her medical malpractice claim with the Patient's Compensation Fund more than one year after the extraction of the 11 teeth. After hearing arguments on this issue, the district court denied Dr. Haygood's exception, finding: "I think that is essentially what Ms. Carter, her concerns were, and only in January of '97 did [she] have more than constructive knowledge that something was wrong. At that time she tried to obtain her medical records to have an attorney or another dentist review those."
After the close of evidence, the district court took the matter under advisement, and then issued written reasons, finding in favor of the Carters. The district court first found there was no written consent given by plaintiff for the extraction of 11 teeth. The district court found plaintiff's testimony that she did not consent to the extraction of 11 teeth more credible, even though Dr. Haygood testified he told plaintiff how many teeth were to be pulled. Further, Dr. Haygood admitted he did not review with Mrs. Carter any problems that could result from the extraction. Dr. Haygood never informed Mrs. Carter she had rampant pyorrhea and gum disease and never discussed with Mrs. Carter that some of the 11 teeth could have been saved with proper treatment. Additionally, the district court found:
Plaintiff has proven through the medical testimony of Dr. Bolton, Dr. Iverstine and Dr. DeLaune that Dr. Haygood did lack the knowledge or skill or failed to use reasonable care and skill that is ordinarily exercised by dentists actively practicing in a similar community or locale. Each of these dentists practice in the State of Louisiana, with Dr. DeLaune and Dr. Iverstine who practice in Ferriday and Dr. Bolton who practices in Alexandria.[[2]] These dentists testified through depositions at the trial of this matter.
Mrs. Carter testified she had constant pain from June 25, 1996 until May, 1999 when she completed treatment by Dr. Iverstine. Mr. Carter's gums would swell and sometimes bleed because her partials were too large or too small that were made by Dr. Haygood. Mrs. Carter had to change from a diet of solid foods to a liquid diet for a period of time because she could not chew or grind food. Mr. Carter testified his wife was not herself during this 2½ year period. Dr. Bolton testified it would cost $12,000.00 to correct the problems she had with her partials, her mouth and her teeth.
Accordingly, the district court awarded the following damages: $22,000 in general damages, $13,616 in special damages, which includes $11,477 to correct problems with her teeth and partials and medicals of $2,139 previously paid to Dr. Haygood, *1266 and $3,000 for loss of consortium to Mr. Carter.
On appeal, the appellate court found Dr. Haygood failed to prove the district court erred in reversing its decision on his motion for summary judgment and in granting the Carters a new trial due to the lack of a record on this issue. The appellate court further found plaintiff's claim against Dr. Haygood that he was negligent in extracting 11 of her teeth without her consent had prescribed, reasoning the extraction of a tooth is an act which is immediately apparent. Thus, prescription should have tolled on plaintiff's claim on September 2, 1997;[3] but even giving plaintiff the benefit of the doubt and the benefit of the discovery exception to the general rule of prescription, and starting the clock for the running of prescription on September 3, 1996, the day she allegedly learned 11 teeth were extracted, prescription would still have tolled on September 3, 1997, more than one year prior to the filing date of her medical malpractice claim on December 18, 1997.[4] Thus, plaintiff's claim as to the extraction had prescribed and the appellate court reversed the district court's judgment on this issue.
Notwithstanding, the court of appeal found plaintiff's claim that Dr. Haygood failed to properly diagnose and treat her gum disease had not prescribed, because the failure to properly treat is not a damage that is readily apparent, and therefore, the discovery rule applies. Because plaintiff filed her claim within one year of the time she first discovered she was suffering from gum disease, her claim had not prescribed. Thus, the court affirmed the district court's ruling on this issue.
Finally, as to the merits of the malpractice claim, the court of appeal reversed the district court's finding of liability on the part of Dr. Haygood, finding the district court was clearly wrong in finding Dr. Haygood breached the standard of care required of a dentist in his locale in the diagnosis of periodontal disease. The court explained: "The standard of care does not require a dentist to perform periodontal probing and charting in all instances, and the diagnosis of such disease may be determined on x-rays [sic], symptoms, and the dentist's clinical judgment." In reaching its conclusion, the court of appeal found Dr. Bolton, the only expert who stated the failure to do periodontal probing and charting would fall below the standard of care, did not practice dentistry in the same locale as Dr. Haygood. Accordingly, the court rendered judgment for the defendants.
We granted the Carters' writ application primarily to address the issue of whether the third category of the doctrine of contra non can be invoked to suspend the prescriptive period under La.Rev.Stat. Ann. § 9:5628, when the plaintiff alleges continuing negligent treatment coupled with defendant's alleged assurances to Mrs. Carter that he could remedy her problem, and to examine the correctness vel non of whether the Carters were reasonable in their reliance upon defendant's assurances. We will further examine the correctness of the court of appeal's reversal of the district court's finding of liability.

LAW AND ANALYSIS

Prescription of the Carters' Claims
An action for medical malpractice sounds in negligence. La.Rev.Stat. Ann. *1267 § 40:1299.41(A)(8). The plea of prescription must be specifically pleaded and may not be supplied by the court. La.Code Civ. Proc. Ann. art. 927(B). Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception. Campo v. Correa, 01-2707, p. 7 (La.6/21/02), 828 So.2d 502, 508. However, if prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. Campo, 01-2707 at p. 7, 828 So.2d at 508; Williams v. Sewerage & Water Bd. of New Orleans, 611 So.2d 1383, 1386 (La.1993). If evidence is introduced at the hearing on the peremptory exception of prescription, the district court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. at 882-83.

La.Rev.Stat. Ann. § 9:5628
The prescriptive period for medical malpractice is provided in La.Rev.Stat. Ann. § 9:5628. At the time of the alleged dental malpractice in 1996, La.Rev.Stat. Ann. § 9:5628 provided:
A. No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.
As we explained in In re Medical Review Panel for Claim of Moses, 00-2643, p. 7-8 (La.5/25/01), 788 So.2d 1173, 1178-79, La.Rev.Stat. Ann. § 9:5628 is a tripartite prescription provision:
First, a one-year prescription period (which parallels the general tort period) is the general rule, which applies to all types of medical malpractice actions. Under this general rule, such actions prescribe one year from the date of the alleged act, omission or neglect. This rule applies when the damages are immediately apparent.
Second, in cases involving damages that are not immediately apparent, a discovery exception to the general rule is codified. The discovery exception embodied in Section 5628 is a codification of the fourth category of contra non valentem for cases in which the cause of action is not immediately knowable. Under this discovery rule, such actions prescribe one year from the date of discovery of the alleged act, omission or neglect.
Third, an overall limitation is placed on cases otherwise falling within the discovery rule. That overall limitation is the underscored portion of Section 5628, which provides that "in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission or neglect." La.Rev.Stat. 9:5628 (emphasis supplied). Translated, this means that "the contra *1268 non valentem type of exception to prescription embodied in the discovery rule is expressly made inapplicable after three years from the alleged injury causing act, omission or neglect." Boutte v. Jefferson Parish Hospital Service District No. 1, 99-2402 at p. 5 (La.4/11/00), 759 So.2d 45, 49. "Superimposed upon [the discovery rule], however, is an overall limitation upon the discovery rule's operation to a period of three years from the date of the alleged act, omission or neglect." Branch v. Willis-Knighton Medical Center, 92-3086 at p. 17 (La.4/28/94), 636 So.2d 211, 216.
A straightforward reading of this statute clearly demonstrates the statute sets forth two prescriptive limits within which to bring a medical malpractice action, namely one year from the date of the alleged act or one year from the date of discovery with a three-year limitation from the date of the alleged act, omission or neglect to bring such claims. Campo, 01-2707 at p. 9, 828 So.2d at 509.

Contra Non Valentem
At the outset, we observe that prescriptive statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; thus, of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted. Foster v. Breaux, 263 La. 1112, 270 So.2d 526, 529 (1972); Knecht v. Board of Trustees for Colleges and Universities, 525 So.2d 250, 251 (La.App. 1st Cir.), writ denied, 530 So.2d 87 (La.1988). To soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: contra non valentem non currit praescriptio, which means that prescription does not run against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La.1992); see also, Plaquemines Parish Com'n Council v. Delta Development Co., Inc., 502 So.2d 1034, 1054 (La.1987); Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285, 287 (1970); R.O.M., Note, Gover v. Bridges: Prescription  Applicability of Contra Non Valentem Doctrine to Medical Malpractice Actions, 61 Tul.L.Rev. 1541, 1541 n. 1 (1986-1987).
Contra non valentem is a Louisiana jurisprudential doctrine under which prescription may be suspended. See Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law § 10-4(b), 222 (1996); see also, R.O.M., supra. Moreover, it is an equitable doctrine of Roman origin, with roots in both civil and common law, and is notably at odds with the public policy favoring certainty underlying the doctrine of prescription. See Plaquemines Parish Com'n Council, 502 So.2d at 1055; see also, R.O.M., supra.
In Plaquemines Parish Com'n Council v. Delta Development Co., Inc., 502 So.2d 1034, 1054-55 (La.1987), we recognized the four instances where contra non valentem is applied to prevent the running of prescription: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. These categories thus allow "the courts to weigh the `equitable nature of the circumstances in each individual case' to determine whether prescription will be tolled." R.O.M., supra at 1545. Contra non valentem in medical malpractice suits *1269 is embodied in La.Rev.Stat. Ann. § 9:5628. White v. West Carroll Hospital, Inc., 613 So.2d 150, 155 (La.1992).
Of these four categories of contra non, only the third category of contra non is implicated in this case, which has been held to encompass situations where an innocent plaintiff has been lulled into a course of inaction in the enforcement of his right by reason of some concealment or fraudulent conduct on the part of the defendant, or because of his failure to perform some legal duty whereby plaintiff has been kept in ignorance of his rights. Crump v. Sabine River Authority, 98-2326, p. 13 (La.6/29/99), 737 So.2d 720, 730. Thus, what we refer to as the third category of contra non applies when the defendant engages in conduct which prevents the plaintiff from availing himself of his judicial remedies. Whitnell v. Menville, 540 So.2d 304, 308 (La.1989).[5]
In certain circumstances, a doctor's continuing professional relationship with his patient might give rise to the suspension or interruption of prescription. Trainor v. Young, 561 So.2d 722, 726-27 (La.App. 2nd Cir.), writs denied, 567 So.2d 1124, 1125 (La.1990). This interruption or suspension of prescription by the continued existence of a professional relationship is based on the premise that the professional relationship is likely to hinder the patient's inclination to sue. Id.
In In re Moses, we explained that though this Court has declined to directly address this issue, our appellate courts have indicated that this type of tolling of prescription that possibly arises out of the continuation of such a special relationship is based on the third category of contra non valentem  where the defendant himself has done some act effectively preventing the plaintiff from availing himself of his cause of action. In re Moses, 00-2643 at p. 11-12, 788 So.2d at 1180-81, citing Wang v. Broussard, 96-2719 (La.App. 1 Cir. 2/20/98), 708 So.2d 487, writ denied, 98-1166 (La.6/19/98), 720 So.2d 1213 (citing Succession of Smith v. Kavanaugh, Pierson and Talley, 565 So.2d 990, 995 (La.App. 1st Cir.1990), writ denied, 567 So.2d 1125 (La.1990)); Acosta v. Campbell, 98-2538 (La.App. 4 Cir. 8/11/99), 744 So.2d 112, writ denied, 99-2651 (La.11/19/99), 749 So.2d 683 (noting that no Louisiana case has held that prescription can be extended solely, or primarily, because of continued relationship and describing this argument as falling squarely within the third category).
We further noted an exception to the rule that the "breach of the duty to right a wrong and make the plaintiff whole simply cannot be a continuing wrong which suspends the running of prescription," when a special relationship, such as a patient-physician relationship, exists between the parties. In re Moses, 00-2643 at p. 10-11, 788 So.2d at 1180, citing Crump v. Sabine River Authority, 98-2326, p. 10 (La.6/29/99), 737 So.2d 720, 729. It is the continuation of the special relationship that offers the possibility of correction of the injury and thus may postpone the running of prescription. In re Moses, 00-2643 at p. 11, 788 So.2d at 1180, citing 54 C.J.S. Limitations of Actions § 177 (1987). Therefore, as long as the patient remains in the physician's care, she could reasonably expect a correction of the diagnosis or tortious treatment. In re Moses, 00-2643 at p. 11, 788 So.2d at 1180, quoting Dobbs, The Law of Torts § 220 at 561.
*1270 In both Taylor v. Giddens, 618 So.2d 834, 843 (La.1993) and In re Medical Review Panel for Claim of Moses, 00-2643, p. 11 (La.5/25/01), 788 So.2d 1173, 1180, we noted the possibility that continued treatment combined with a continued professional relationship could possibly result in a suspension of prescription. We further noted two appellate cases which recognized this principle based on the fact that the continuing relationship is "likely to hinder the patient's inclination to sue." Taylor, 618 So.2d at 843; In re Moses, 00-2643 at p. 11, 788 So.2d at 1180, citing Trainor v. Young, 561 So.2d 722 (La.App. 2d Cir.), writ denied, 567 So.2d 1124, 1125 (La.1990), and Abrams v. Herbert, 590 So.2d 1291 (La.App. 1st Cir.1991). Because the record in Taylor revealed the malpractice victim's relationship with the doctor was no more than "perfunctory," we declined to address the issue of whether prescription could be suspended based on the doctor's continued treatment of the patient. Taylor, 618 So.2d at 843.
Moreover, because neither cumulative damage to plaintiff, nor continuing treatment by defendant were present in the record before us in In re Moses, we left open the question of whether continuing treatment could be invoked to enlarge or suspend the running of prescription. In re Moses, 00-2643 at p. 21, 788 So.2d at 1186. Thus, the theory known as the continuing treatment or relationship rule[6] as a form of contra non has not been applied by this Court in the context of a medical malpractice claim in which the plaintiff has filed her cause of action within the three-year repose period, but more than a year after the date of malpractice.[7]
However, this Court has addressed the applicability of an analogous rule, the "continuous representation rule," in the context of legal malpractice. In Lima v. Schmidt, 595 So.2d 624, 630 (La.1992),[8] we explained:

*1271 More recently, in Braud v. New England Insurance Co., 576 So.2d 466 (La.1991), we recognized that prescription will be suspended "during the attorney's continuous representation of the client regarding the specific subject matter in which the alleged wrongful act or omission occurred." Id. at 468 (collecting cases). This suspension principle is based on the third application of contra non valentem, which suspends prescription when the debtor has done some act effectually to prevent the creditor from availing himself of his cause of action. Blanchard v. Reeves, 469 So.2d 1165, 1168 (La.App. 5th Cir.), writ denied, 476 So.2d 347 (La.1985).
This suspension principle, labeled the "continuous representation rule," has been recognized by a host of Louisiana appellate decisions and has been widely recognized in other jurisdictions. See Annot., 32 A.L.R.4th 260 (1984). "[T]he continuous representation rule appropriately protects the integrity of the attorney-client relationship and affords the attorney an opportunity to remedy his error (or to establish that there has been no error), while simultaneously preventing the attorney from defeating the client's cause of action through delay." Wall v. Lewis, 393 N.W.2d 758, 763 (N.D.1986). The rationale behind this rule is that "[a] plaintiff cannot justly be held to be `sleeping on his rights' when he is relying upon a honored fiduciary relationship." Note, Civil Procedure-Statute of Limitations Accrual in Attorney Malpractice Actions: Thorpe v. DeMent, 20 Wake Forest L.Rev. 1017, 1038 (1984). Indeed, to hold to the contrary "would require a client to hire a backup lawyer to continually review the work of the primary lawyer." Gill v. Warren, 751 S.W.2d 33 (Ky.App.1988); See also Olivier v. National Union Fire Insurance Co., 499 So.2d 1330, 1337 (La.App. 3rd Cir.1986) (contrary holding would allow attorney to defeat malpractice claim by using appeal process to continue relationship until prescription has run).
This rule is especially apt in the context of "an ongoing, continuous, developing and dependent relationship between the client and attorney, with the latter seeking to rectify an alleged act of malpractice." Peduto v. Durr, 97 App.Div.2d 959, 468 N.Y.S.2d 953, 955 (4th Dept.1983).
The Lima court also clarified that the continuous representation rule should apply only "where the professional's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship." Id.
Extending the jurisprudence of the "continuous representation rule" by analogy, the continuing treatment rule would require a plaintiff to establish the existence of (1) a continuing treatment relationship with the physician, which is more than perfunctory, during which (2) the physician engaged in conduct which served to prevent the patient from availing herself of her cause of action, such as attempting to rectify an alleged act of malpractice.
With this understanding and relying on this analogous jurisprudence, we now examine the present case to determine whether the continuing treatment rule is *1272 applicable in this medical malpractice context.

Application of Continuing Treatment Rule
Plaintiffs' position is that Mrs. Carter was treated continuously by Dr. Haygood from June 25, 1996, until her last visit on January 6, 1997, a fact which is not disputed. Plaintiff's purpose for seeing Dr. Haygood was to replace a partial she received 22 years before.
During this time of treatment, plaintiff alleges "defendant failed to treat Carter for gum disease or pyorrhea, failed to instruct petitioner that she had periodontal disease, failed to properly measure or calibrate the periodontal pockets, failed to instruct petitioner in proper oral hygiene techniques, failed to treat the alleged disease and failed to refer petitioner to a periodontist for treatment." Further, rather than treating plaintiff's gum disease, Dr. Haygood simply extracted 11 teeth, causing plaintiff permanent and substantial damage. Therefore, plaintiffs are seeking recovery for the medical malpractice that occurred during the course of this comprehensive treatment, and according to plaintiffs' petition, the process of replacing the partials necessarily entailed both the diagnosis and treatment of gum disease, as well as the removal of some teeth.
Plaintiffs' claims against Dr. Haygood are not limited to the improper extractions. Rather, plaintiffs allege the improper extractions caused the partials to not fit properly and the permanent teeth that remained could not properly hold the partials.
It only became apparent to plaintiff in January 1997, when Dr. Haygood refused to see her again, that Dr. Haygood had no intention of fitting her with permanent partials and that she was stuck with broken teeth and with ill-fitting temporary partials. She filed a malpractice claim within one year of that time, and therefore, plaintiff asserts her claim was timely.
Although plaintiff did begin complaining about the extractions and the ill-fitting partials immediately, plaintiff claims she was lulled into waiting several months to get her partials right by Dr. Haygood's repeated assurances to "hang in there" and his repeated attempts to correct the partials. Additionally, plaintiffs allege that at no time prior to January 1997, did Dr. Haygood advise Mrs. Carter that there was nothing more he could do for her and that her situation was not going to improve. According to plaintiff's testimony, Mrs. Carter did request her medical records on several occasions, but Dr. Haygood's office refused to give her a copy of her records. Moreover, even after he refused to see her, his office still refused to give her a copy of her records until after her medical malpractice claim was filed. Plaintiffs assert this failure of Dr. Haygood to release plaintiff's medical records is at the very least highly suggestive of an intent either to mislead the plaintiff or cover up past mistakes.
The court of appeal treated the improper extractions, i.e., defendant's failure to attempt to obtain permission for the extraction and/or failure of defendant to attempt to save the teeth before pulling them, and the failure of defendant to diagnose plaintiff's gum disease as two separate acts of malpractice. We find, as the district court was not manifestly erroneous in making the factual determination that the extractions and the failure to diagnose the gum disease are all part of Dr. Haygood's continuing course of treatment of Mrs. Carter for the replacement of the partials. Based upon plaintiffs' petition, it is evident the plaintiffs only sought recovery for the malpractice, i.e., the breach of the ordinary standard of care which, according to the testimonies of Dr. Delaune *1273 and Dr. Bolton upon which the district court relied, required periodontal probing to diagnose and treat periodontal disease prior to performing any extensive dentistry, such as the extraction of 11 teeth, that occurred during the course of her treatment.
The district court found plaintiff did not consent to the extraction of the 11 teeth, which could arguably place this action in the realm of an intentional tort; however, plaintiffs do not seek recovery on the theory of consent, but rather, seek recovery for the negligent extraction of 11 teeth in the absence of any attempt to treat the "savable" teeth with non-surgical treatment, as the extraction of some teeth was necessary for the treatment she sought, i.e., the replacement of her partials. Plaintiffs allege it was malpractice to remove all the teeth without attempting to determine which teeth could be saved and to treat those that were savable for the successful replacement of her partials.
Prescription runs against a plaintiff who has knowledge of facts that a condition may be the result of improper treatment only if there is no effort by the physician to mislead or cover up information available to the plaintiff through inquiry or professional medical or legal advice during the continuing treatment. Notably, unlike Taylor or In re Moses, a continuing treatment relationship did exist between Mrs. Carter and Dr. Haygood. This relationship coupled with Dr. Haygood's assurances to "hang in there" and that he would "get it right" and his various efforts to remedy her problems with her partials during this continuing treatment relationship did effectively prevent her from pursuing her cause of action and worked to ameliorate plaintiffs' actual knowledge of the malpractice.
Throughout his treatment of plaintiff, Dr. Haygood assured the plaintiff he would be able to rectify her problems. The possibility of correction asserted by Dr. Haygood continued the doctor-patient relationship. This relationship did not end until Dr. Haygood refused to treat the plaintiff in January 1997. Furthermore, Dr. Haygood did not release her medical records until after she filed suit, even though she had repeatedly requested her records.
The court of appeal erroneously focused entirely upon whether plaintiff had actual knowledge of the malpractice when her teeth were pulled and failed to consider the continuing treatment relationship and Dr. Haygood's assurances and efforts to correct Mrs. Carter's problems. Based upon Dr. Haygood's repeated assurances and his continuous efforts to correct Mrs. Carter's problem, we find plaintiff was reasonable in relying upon his assurances. Dr. Haygood's actions in this case served to effectively prevent the plaintiffs from pursuing their claims against him. To hold otherwise would serve to erode and destroy the element of trust so vital to the physician-patient relationship by urging a patient to pursue litigation immediately without affording her treating physician the opportunity to find a solution. We simply refuse to allow the defendant in this case to use plaintiff's compliance with his request to allow him the chance to fix her problem against her to claim prescription. Therefore, we find the application of the third category of contra non valentem under the continuing treatment rule appropriate in this case.
Because the factual findings of the district court on the issue of prescription are reasonable in light of the record reviewed in its entirety, the court of appeal could not reverse even though it was convinced that had it been the trier of fact it would have weighed the evidence differently. See Stobart, 617 So.2d at 882-83. Accordingly, *1274 we reverse the court of appeal's judgment and reinstate the trial court's ruling on the issue of prescription. We now turn to the issue of liability.

Medical Malpractice  Locality Rule
Due to the defendant's failure to object contemporaneously to the testimony of Dr. Bolton,[9] Dr. Bolton's testimony could be considered and used to reinforce the district court's ultimate findings and determinations. Consequently, the defendant waived his right to object on appeal to the admissibility of Dr. Bolton's testimony, and the court of appeal erred in granting the defendant relief on these grounds and in reversing the district court's finding of liability.[10] Therefore, the issue of locality is not properly before us, nor was it properly before the court of appeal, and accordingly, we reverse the court of appeal's determination of liability.

*1275 DECREE
For the foregoing reasons, we reverse the court of appeal's judgment and reinstate the district court's judgment in its entirety.
REVERSED.
TRAYLOR, J., dissents.
VICTORY, J., dissents and assigns reasons.
KIMBALL, J., dissents in part and assigns reasons.
KIMBALL, Justice, dissents in part.
In my view, Mrs. Carter's claims with respect to the continuing treatment of the gum disease and the partials have not prescribed; however, her other claim for lack of informed consent with respect to the teeth extractions has prescribed because the extractions were immediately apparent. Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is a victim of a tort. Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502.
VICTORY, J., dissenting.
In my view, there is no need to discuss the doctrine of contra non valentem under the continuing treatment rule in this case regarding plaintiffs' claim that Dr. Haygood committed malpractice in extracting eleven of Mrs. Carter's teeth. Clearly, any claim for malpractice that might have occurred for extraction of the teeth or lack of consent is prescribed as she had knowledge of these claims as early as September 3, 1996. In my view, these claims stand separately from her claim that Dr. Haygood committed malpractice in treating and diagnosing her gum disease.
I also agree with the court of appeal's determination that the trial court was clearly wrong in finding that Dr. Haygood breached the standard of care required of a dentist in his locale in the diagnosis of periodontal disease. Under La. R.S. 9:2794, a general dentist such as Dr. Haygood who is not a specialist is held to the standard of care of other dentists actively practicing in a similar community or locale and under similar circumstances. Pursuant to this Court's holding in McLean v. Hunter, 495 So.2d 1298 (La.1986), a specialist from outside the community, such as Dr. Bolton, may testify if he has knowledge of the subject matter. However, his testimony is limited by the community standards when evaluating the standard of care of the general practitioner. Dr. Bolton's testimony that a dentist would deviate from the standard of care if he did not use a probe to diagnose and evaluate a patient for gum disease was not limited to the local community standards applicable to Dr. Haygood.
The majority opinion holds that Dr. Bolton's testimony could be considered because the defendant failed to object contemporaneously to Dr. Bolton's testimony. However, under La. R.S. 9:2794, the plaintiff bears the burden of proving that the defendant's conduct fell below the standard of care of the general practitioner in a similar community or locale and in similar circumstances. To qualify a witness as a medical expert, it must be shown that the witness (1) has the required professional knowledge, learning, and skill of the subject under inquiry sufficient to qualify him to speak with authority on the subject, and (2) is familiar with the standard required of a physician under similar circumstances. McLean, supra at 1302. Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility. Id.; see also Taylor v. Sauls, 99-1436 (La.App. 3 Cir. 9/6/00), 772 So.2d 686, 691, writ denied, 00-2805 (La.12/8/00), 776 So.2d 461 *1276 (generally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect of the weight to be given such testimony, not to its admissibility). Id. In McLean, we explained that:
A. In a malpractice action based on the negligence of a ... dentist licensed under R.S. 37:751 et seq. ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by ... dentists ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by ... dentists ... within the involved medical specialty.
As the court of appeal correctly noted, this provision sets forth the requisite burden of proof, but does not specify or set limits on the qualifications of a professional witness who may be presented to sustain the burden.
We now hold it is a specialist's knowledge of the requisite subject matter, rather than the specialty or sub-specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised by general practitioners. A particular specialist's knowledge of the subject matter on which he is to offer expert testimony should be determined on a case by case basis.
Implicit support for our holding is provided by La.R.S. 9:2794(B), which provides that a party to a malpractice suit has "the right to subpoena any ... dentist ... for trial to establish the ... degree of care ordinarily exercised." A periodontist such as Dr. Lovelace is obviously no less a dentist because he engages in a specialty practice rather than a general dentistry practice.
Id. at 1302. Just as in that case, Dr. Bolton is no less a dentist because he engages in practice in a different locality than defendant. Further, his broad deposition was offered for his knowledge on the subject matter. However, his testimony was entitled to no weight on the issue of whether the use of a periodontal probe was required under the standard of care of a dentist practicing in Vidalia, Louisiana.
Thus, in my view, the fact that the defendant did not object to the introduction of the deposition testimony of Dr. Bolton does not prevent him from raising the issue that plaintiff did not meet his burden of proof, because Dr. Bolton's testimony does not prove that defendant's conduct fell below the standard of care in defendant's community under similar circumstances.[1]
Therefore, based on the testimony of the other dentists that a probe was not necessary to diagnose gum disease under *1277 the facts of this case, I would affirm the court of appeal's finding that plaintiffs failed to prove that Dr. Haygood committed malpractice.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] Both the plaintiffs' and the defendants' briefs to this court note the date Mrs. Carter filed her medical malpractice complaint was December 16, 1997. As the medical malpractice complaint is not made a part of this record, we defer to the court of appeal.
[2] Dr. Bolton practices in Monroe, Louisiana.
[3] The court noted: "August 30, 1997 was a Saturday, and September 1, 1997 was Labor Day. Therefore, prescription tolled on September 2, 1997. La.Civ.Code art. 3454."
[4] See supra, note 1.
[5] Note, in granting the writ in Gover v. Bridges, 497 So.2d 1364 (La.1986), this court signaled it would "continue to apply the long-established equitable principle that the contra non doctrine is, in part, a recognition that `no one should be able to take advantage of his own wrongful act,'" as evident under the third category of the doctrine. See R.O.M., supra.
[6] See Dobbs, supra at 562 (citing Borgia v. City of New York, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962), aff'd, 15 N.Y.2d 665, 204 N.E.2d 207, 255 N.Y.S.2d 878).
[7] Note, in the Whitnell rulings, this Court raised the issue of whether the so-called "third category" of contra non applies in the case of medical malpractice to extend the time for the prosecution of a claim beyond the statutory three-year period. While the Court has never actually applied this third category to suspend prescription beyond three years, it gave the plaintiff in Whitnell the opportunity to return to the district court and attempt to establish a suspension beyond three years for the doctor's alleged failure to inform his patient of the diagnosis. Whitnell v. Menville, 540 So.2d 304, 310 (La.1989). Notably, the issue in Whitnell focused more on the doctor's alleged failure to inform his patient of the diagnosis, rather than a continuing treatment relationship.

On remand, the district court found the plaintiff's claim prescribed, and the court of appeal affirmed. See Whitnell v. Silverman, 592 So.2d 429, 432 (La.App. 4th Cir.1992). In denying plaintiff's application concerning the issue of the application of the third category of contra non, this Court stated: "The trial court correctly concluded that the doctor did not prevent timely filing of plaintiff's action intentionally, fraudulently, or by ill practice." Whitnell v. Silverman, 598 So.2d 345 (La.1992). At the same time this Court denied plaintiff's application concerning the issue of prescription, the Court granted the plaintiff's writ and remanded the case to the district court for an evidentiary hearing and ruling on the constitutionality of La.Rev.Stat. § 9:5628. Thereafter, on the third hearing of this case by this Court, the constitutionality of La.Rev.Stat. § 9:5628 was upheld. Whitnell v. Silverman, 95-0112 (La.12/6/96), 686 So.2d 23.
[8] This doctrine as announced in Lima arguably would not now suspend prescription of legal malpractice claims filed beyond the three-year repose period of La.Rev.Stat. Ann. § 9:5605, as Subsection B clearly provides: "The one-year and three-year repose periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended." However, we cite this analogous rule in this case to determine whether a medical malpractice plaintiff may invoke the continuing relationship rule to defeat an exception of prescription when the plaintiff files suit well within the three-year repose period, but more than one year from the date of the malpractice.
[9] A true copy of the court minutes from the first morning of trial in this matter can be found on page 1 of the record. The minutes reflect that on that morning Dr. Bolton's deposition testimony was offered and entered into the evidence as # P2:

The attorney's [sic] stipulated to the following exhibits and the exhibits were offered and entered.
# P2  DEPOSITION OF DR. BOLTON
# J1 THROUGH # J14 (JOINT EXHIBITS)
No objection to the admissibility of Dr. Bolton's testimony is apparent in the minutes.
The official trial transcript provides the actual offering of the exhibits by trial counsel:
MR. MESSINA: Your Honor, before we get started I think that there are a couple of matters I think that we can probably take up now that we can dispose of Jay, do you want to do that now and that way we can move along. There are a bunch of depositions that we would like to submit joint stipulations to the Court.
THE COURT: All right.
MR. MESSINA: Those I think, Mr. Bolen has already and I'm going to defer to him as far as the Exhibits. The deposition of Dr. Padge Bolton we would like to introduce that to the Court to review instead of having him called live as this Court is well aware of the difficulty of getting a dentist or any doctor to come here and testify. Dr. DeLaune, Dr. Iverstine and Dr. Hawkins and also Ms. Ruby Coon.
MR. BOLEN: Ruby Coon Andrus.
MR. MESSINA: Anders, I'm sorry.
MR. BOLEN: Andrus 
MR. MESSINA: Those will be the depositions, the four and five depositions that we will submit for the Court to review.
THE COURT: Are they going to be Joint Exhibits?
MR. BOLEN: No ma'am.
MR. MESSINA: I'm sorry.
MR. BOLEN: As to Dr. Bolton that is a Plaintiff's Exhibit.
MR. MESSINA: Sure, Plaintiff Exhibit, I'm sorry.
THE COURT: All right I think you 
MR. BOLEN: That would be Plaintiff 1?
MR. MESSINA: Plaintiff 2.
MR. BOLEN: Planitiff 2 and then the defendant is introducing the deposition of Dr. Hawkins which would be Defendant's Exhibit 1, Dr. DeLaune which would be Defendant's Exhibit 2, Dr. Inverstine would be Defendant's Exhibit 3, deposition of Ruby Coon Andrus would be Defendant's Exhibit 4. If you wanted to, Rodney, make those four joint exhibits 
MR. MESSINA: I don't have a problem with that. I was there. I mean, we'll make them joint exhibits, that's fine. I have no problem with that.
THE COURT: All right so the J-1 Dr. DeLaune, J-2 Dr. Hawkins, J-3 Dr. Iverstine, and J-4 Ms. Andrus?
MR. BOLEN: Andrus, A  d-r-u-s Your Honor.
THE COURT: All right and then P-2 will be Dr. Bolton's deposition. Those are ordered filed into the record, Madam Clerk.
MR. MESSINA: Here's the original of Dr. Bolton.
MR. BOLEN: May I approach Your Honor?
(Counsel presents deposition to the Clerk).
Apparently, no objection was made to the admissibility of Dr. Bolton's testimony at the time the deposition was filed into the record.
[10] It is not evident from the record how the issue of locality was raised before the court of appeal.
[1] While one court has held that the failure to object contemporaneously to the testimony of a dentist on the basis of the locality rule constitutes a waiver of the right to object on appeal to the admissibility of his testimony on appeal, Magos v. Feerick, 96-686 (La.App. 3 Cir. 12/26/96), 690 So.2d 812, 818, the case relied on by that court for that proposition, Trans-Global Alloy Limited v. First National Bank of Jefferson Parish, 583 So.2d 443 (La.1991), is not relevant to the distinct legal issues present in dental malpractice cases. Trans-Global Alloy Limited was a breach of contract/breach of fiduciary duty case wherein this Court held that the defendant's failure to object to testimony on the basis that it was opinion testimony regarding ultimate issues of law constituted a waiver of the right to object on appeal to the introduction of that evidence.