DREW, J.
| ¡Jimmie Barnett appeals a judgment ordering him to pay to his former wife one-half of an early withdrawal penalty that was incurred when his sister, to whom he *1046 had granted power of attorney, removed former community property from an annuity.
Concluding that the trial court erred in denying Jimmie’s exception of insufficiency of service of process, we vacate the judgment and dismiss the claims against him without prejudice.
FACTS
Jimmie Barnett and Yvonne Barnett were married in 1970. Yvonne filed for divorce on January 20, 2004. A judgment of divorce was rendered on February 1, 2005.
On September 28, 2004, Jimmie granted a power of attorney to his sister, Julia Budwah. Jimmie revoked this power of attorney the next month. |sOn November 19, 2004, Jimmie again granted a power of attorney to Budwah. However, it was not until January 5, 2006, that Budwah accepted the power of attorney.
Jimmie and Yvonne each owned one-half of former community funds held in five annuities managed by AmerUS Annuity Group. Two of these annuity accounts, numbered 17168 and 32609, listed Jimmie as the policyholder.[1] Four of the accounts contained less than $10,000. Account 17168 held over $400,000.
Jimmie had lingering health problems and had been placed in a nursing facility when Budwah accepted power of attorney in 2006.
Jimmie’s only income at the time was from Social Security benefits. Concerned about how Jimmie’s medical expenses would be paid, Budwah went to a local Medicaid office, where she was told that Jimmie was not eligible for Medicaid because of the annuities.
On February 14, 2006, Budwah wrote to AmerUS requesting the withdrawal of all funds and the closing of account 32609 and any other accounts at AmerUS. AmerUS wrote to Budwah 10 days later that it had received Budwah’s request, but because the annuity was community property subject to a pending divorce settlement, the funds from the annuity |4could not be distributed at that time. AmerUS added that upon receipt of a copy of the final settlement, it would process Budwah’s request.
On May 31, 2006, Yvonne requested a partial withdrawal of funds from account 32609. Yvonne wrote on the policy disbursement request form that the withdrawal was to be without penalty because Jimmie had been in a hospital or a nursing home since December of 2005. The next month, AmerUS wrote to Yvonne’s counsel that it was unable to process the request for withdrawal of funds by Yvonne because there was a restraining order.
Yvonne and Budwah, on behalf of Jimmie, executed an Act of Partition and Settlement of Community Property (“settlement”) on September 27 and October 3, 2006. The settlement provided, in relevant part:
[A]n agreement was made between the parties on November 22, 2004, that the AmerUS and Alliance annuities would be divided by withdrawing the maximum amount that could be withdrawn each year, without penalty, and that each party or their agent would sign the necessary forms to do so and that the party receiving the check would make a copy of the check and send one-half (1/2) of the amount to the other party along with a copy of the check. The parties are equal owners of these accounts and all *1047 injunctions and restraining orders are hereby vacated.
In the event either party makes a withdrawal from any of the aforementioned accounts, said party shall endorse the check, forward the check to Sandra S. Salley, attorney for Yvonne Sanders Barnett, who shall make copies of said | scheck, place it in the Salley & Salley, LLC, IOLTA account and issue individual checks for Jimmie Carl Barnett and Yvonne Sanders Barnett. Said check will be accompanied by a copy of the check received by and placed into the account of Salley & Salley, LLC.
The partition was approved by the court on July 25, 2007.
AmerUS wrote to Budwah on November 6, 2006, that it had received the papers granting her power of attorney over Jimmie. Four days later, Budwah completed a policy disbursement request form on behalf of Jimmie seeking all of the funds in accounts 17168 and 32609. She checked a box indicating that she elected to surrender the accounts for their outstanding balances “net of any applicable surrender charges.”
On November 13, 2006, AmerUS wrote to Jimmie to ensure that he understood that surrender penalties of approximately $48,000 in account 17168, and approximately $943 in account 32609, would be incurred as a result of the requested withdrawal of funds from those accounts. On November 20, 2006, Budwah completed and signed forms on behalf of Jimmie indicating that he still wanted to proceed with the withdrawals.
On November 29, 2006, AmerUS sent Jimmie checks in the amounts of $357,551.14 and $8,432.36. The gross distribution for account 17168 was $406,308.11, with a surrender penalty of $48,756.97. The gross distribution for account 32609 was $9,363.22, with a surrender penalty of $842.69.[2]
|fiOn December 6, 2006, Budwah purchased a 6-month CD at Capital One for $300,000. The CD bore an interest rate of 4.89%, and its ownership was listed as Jimmie or Budwah. The remainder of the money was retained by Budwah to pay outstanding medical bills and future bills as they would be received.
Yvonne stated that in December of 2006, she received a $6,000 check from Budwah to repay her for money that she had loaned to Budwah to pay for Jimmie’s medical expenses. She assumed the money came from one of the smaller annuities. Yvonne considered Budwah to be evasive about the annuities, and claimed that she first found out that Budwah had closed the largest annuity when her attorney informed her of this in January of 2007.
Yvonne’s counsel received a letter from Capital One on March 5, 2007, stating that in accordance with Budwah’s request, $57,551.14 from AmerUS had been deposited into an account to pay past-due bills and ongoing expenses for Jimmie.
PROCEDURAL HISTORY
On January 2, 2008, Yvonne filed a petition for return of funds against Jimmie and Budwah. It asserted that Budwah violated the settlement agreement when she removed the funds, incurred the penalty, and did not notify Yvonne. Yvonne prayed that she be reimbursed for the penalties |7caused by the violation of the settlement agreement. Service was requested only upon Budwah.
The petition was amended to assert jurisdictional and venue grounds. This time, service was requested upon Jimmy through Budwah.
*1048 Jimmie filed the exception of insufficiency of service of process, among other exceptions. The exceptions were denied in April of 2009 and reduced to judgment on June 15, 2009.
Following a trial on the merits, the exception of prescription was denied, and the trial court concluded that Jimmie owed $24,378[3] to Yvonne. Jimmie has appealed that judgment. The claims against Bud-wah were dismissed at the trial, and this dismissal is reflected in a separate judgment that has not been appealed.
DISCUSSION

Prescription

Jimmie contends on appeal that Yvonne’s January 2, 2008, lawsuit is prescribed as her claims are for conversion and accordingly subject to a prescriptive period of one year. He argues that Yvonne was aware of her cause of action no later than December 15, 2006. Yvonne replies that because Budwah failed to abide by the terms of a contract, the settlement, [swhen she incurred the penalties, the 10-year prescriptive period for contract claims is applicable.
When evidence is introduced at the hearing on the peremptory exception of prescription, the district court’s findings of fact are reviewed under the manifest error-clearly wrong standard of review. Canter v. Haygood, 2004-0646 (La.1/19/05), 892 So.2d 1261.
Ordinarily, the party raising the exception of prescription bears the burden of proof at the trial of the peremptory exception. Campo v. Correa, 2001-2707 (La.6/21/02), 828 So.2d 502. However, if prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. Id.
A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. An obligation may be the promise to do or not to do something. First Louisiana Bank v. Morris & Dickson Co., LLC, 44,187 (La.App.2d Cir.4/8/09), 6 So.3d 1047. A compromise is a contract. La. C.C. art. 3071.
The prescriptive period for a breach of contract claim is 10 years from the date that the cause of action arose. See La. C.C. art. 3499; Corbello v. Iowa Production, 2002-0826 (La.2/25/03), 850 So.2d 686.
In Huckabay v. Huckabay, 485 So.2d 165 (La.App. 2d Cir.1986), a former wife sued her former husband to enforce a community property settlement. She claimed that she was owed money to which she was entitled under the terms of the settlement. The former husband contended that her action had prescribed. This court disagreed, concluding that the former husband obligated himself in the settlement to give certain things to his former wife, and when he allegedly failed to perform, she was entitled to bring an action to demand performance. Accordingly, this court found that the prescriptive period of 10 years for contract claims was applicable to the former wife’s claim.
We note that La. C.C. art. 2369.3 states the following regarding the duty to preserve and to manage former community property under a spouse’s control:
A spouse has a duty to preserve and to manage prudently former community property under his control, including a former community enterprise, in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.
*1049 Comment (c) to art. 2369.3 reads that a claim for breach of the obligation imposed by that article is subject to the prescriptive period of 10 years found in La. C.C. art. 3499. However, comment (c) also reads that the |induty imposed by art. 2369.3 arises at the moment of termination of the community regime and continues until a partition of the former community property occurs. A partition, albeit one that had yet to be judicially approved, had already been agreed to by the parties when Budwah withdrew the funds. Accordingly, it does not appear that art. 2369.3 is applicable to the matter at hand.
This claim clearly arises from an alleged breach of an obligation imposed by the settlement and is subject to a prescriptive period of 10 years applicable to contract claims. The trial court was not clearly wrong in denying the exception of prescription.

Breach of Settlement

Jimmie contends that the trial court was clearly wrong in concluding that there was a breach of the settlement. He urges that the request for funds was made in February of 2006, before Budwah signed the settlement. We disagree.
The February 2006 request was denied at that time because AmerUS was under the impression that the annuity was community property subject to a pending divorce settlement. AmerUS acknowledged in November of 2006 that it was in receipt of the document granting the power of attorney. After Budwah signed the settlement in October of 2006, she successfully Insubmitted a disbursement request seeking all of the funds in accounts 17168 and 32609. The relevant request for funds was clearly made after the signing of the settlement. This argument is without merit.

Entitlement to Damages

Jimmie further contends that a surrender penalty is not recognized as a damage under Louisiana law. We again disagree.
In Gibson v. Gibson, 96-1472 (La.App. 3rd Cir.4/2/97), 692 So.2d 708, the former husband withdrew community funds from a retirement fund and incurred a tax liability on behalf of himself and his former wife. She sought reimbursement by filing a motion to traverse the detailed descriptive list. The appellate court concluded that the former husband was liable to the former wife for her share of the tax liability-
We note that in reaching its conclusion, the appellate court in Gibson found that the former husband had breached his duty under La. C.C. art. 2369.3, which we have already stated is not applicable to the case at hand. Although this point distinguishes Gibson from the instant case, in which the obligation arises by contract, Gibson remains relevant in that it recognized that a party can damage the other by incurring a charge as a result of a withdrawal from a joint investment or retirement account.
[12If the former wife in Gibson had been consulted about her former husband’s actions, she could have taken steps to avoid the tax liability, and at the very least, she could have decided how and when to withdraw her money. Likewise, Yvonne was deprived of the option of leaving her share of the funds in account 17168 and avoiding the substantial penalty when Budwah unilaterally withdrew all of the funds from that account.
In support of his argument, Jimmie cites Day v. Day, 2002-0431 (La.App. 1st Cir.5/28/03), 858 So.2d 483, writ denied, 2003-1845 (La.11/7/03), 857 So.2d 492; and Thibodeaux v. Thibodeaux, 93-1445 (La.App. 3rd Cir.6/1/94), 640 So.2d 713, writ denied, 94-1792 (La.10/28/94), 644 So.2d 659. Those cases can be readily distinguished as the damages sought were not for a penalty or other charge such as *1050 taxes, but rather were for an alleged decrease in the investment value of former community property.
In Day, the court concluded that the former wife could have withdrawn her share of funds from a 401(k) account, but when she left her share of the funds in the account, she had to accept whatever depreciation or appreciation in value occurred. In Thibodeaux, the former husband transferred former community assets in a retirement plan from a risky fund where it had lost over $10,000 the previous quarter to a less risky fund within the retirement plan. The former wife in Thibodeaux sought | ^reimbursement for the increase in investment value had it remained in the original fund. The court concluded that she was not entitled to reimbursement because the former husband made the transfer in an effort to salvage the value of their investment, the former wife failed to establish her alleged loss with sufficient specificity since she did not show the investment appreciation while in the less risky fund, and she did not show that a prudent administrator would have kept the investment in the more risky fund.
Yvonne did not suffer an inadvertent decrease in value of the annuity because of market conditions and investment choices. She suffered a loss because of Budwah’s intentional action.
Budwah knew that she would violate the settlement if she withdrew enough money from the annuity accounts to trigger penalties. She knew from correspondence from AmerUS how much the penalties could be.
Budwah contended that she did not know how much money was in the annuities when she requested the withdrawal in February 2006. Budwah claimed that she did not know that half of the funds in the annuity accounts belonged to Yvonne when she requested the money from AmerUS in November of 2006. She believed that because the accounts were in Jimmie’s name, the funds belonged to him.
114Budwah asserted that she was motivated by concern for her brother when she knowingly violated the settlement and withdrew over $400,000. Nevertheless, bitterness between the parties was evident. Budwah knew the CD interest would not make up for the penalty, but that fact did not bother her because she was worried only about her brother’s welfare. Budwah was unconcerned about Yvonne when she withdrew the money because she did not think that Yvonne was in desperate need of money.
Budwah admitted that she was evasive with Yvonne. She delayed telling Yvonne about the withdi'awal of over $400,000 as long as she could. Budwah testified that she did not care if Yvonne or her attorney knew about it because Jimmie needed the money.
Budwah admitted that she did not care if a large penalty was incurred by the full withdrawal because she did not want to fool around with withdrawing just enough each month to pay his expenses. Yvonne asserted that she discussed with Budwah that she could withdraw up to 20% without incurring a penalty because Jimmie had been confined to a hospital or nursing home for a lengthy period of time.
Jimmie’s outstanding medical bills were less than $50,000 when Budwah obtained the funds. Budwah estimated that the monthly nursing home fee was around $3,635. Another expense came from Jimmie’s high | isdrug bills that were not covered by Medicare. Jimmie’s only source of income was his monthly Social Security check, apparently just under $1,000 which was directly deposited into his nursing home account.
It is obvious that it was unnecessary for Budwah to make a full withdrawal of the *1051 funds in the accounts in order to cover Jimmie’s medical care. This is evident by the $300,000 CD with a six-month maturity that Budwah purchased.
Yvonne was entitled to be reimbursed for one-half of the penalty incurred because of the early withdrawal. The trial court determined this amount was $24,378. Jimmie contends the award should be no more than $12,309.20 because of various offsets. However, because we vacate this judgment on other grounds, we need not consider the issue of offsets.

Insufficiency of Service of Process

Jimmie contends that the trial court erred in denying his exception of insufficiency of service of process as service was made only on Budwah and never on Jimmie. We agree as Budwah was never designated as his agent for service of process.
La. C.C.P. art. 5251(2) states that “agent for the service of process” means the agent designated by a person or by law to receive service of 11ñprocess in actions and proceedings brought against him in the courts in this state.
The power of attorney document makes no mention of Jimmie designating Budwah as his agent for service of process. The closest it makes to any such declaration is as follows:
To represent me fully in all matters of litigation, whether as plaintiff or defendant, or in response to other claims or demands or to make claims or demands; including, without limitation, execution and filing of pleadings, responding to pleadings, hiring attorneys, agreeing to mediation or arbitration and making settlements.
Nevertheless, this is not an express designation of Budwah as Jimmie’s agent for service of process. Therefore, service on Jimmie through Budwah was without effect.
Yvonne contends that because Jimmie did not seek supervisory review of this adverse ruling, he waived it and is precluded from raising this issue on this appeal.
Normally when an appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him in addition to the review of the final judgment. See Alexander v. Palazzo, 2008-1541 (La.App. 1st Cir.2/13/09), 5 So.3d 950. However, some adverse interlocutory rulings, such as the denial of the exception of Jjjimproper venue and the refusal of a request for arbitration, cannot as a practical matter be corrected on appeal after a final judgment. See Danny Weaver Logging, Inc. v. Norwel Equipment Co., 33,793 (La.App.2d Cir.8/23/00), 766 So.2d 701, and Tubbs Rice Dryers, Inc. v. Martin, 44,800 (La.App.2d Cir.2/24/10), 33 So.3d 926. In those instances, the party should either seek supervisory review pursuant to La. C.C.P. art. 2201, or file an appeal under La. C.C.P. art. 2083(C) if it is expressly provided by law. That is not the case with the denial of the exception of insufficiency of service of process.
La. C.C.P. art. 1201(A) provides that citation and service thereof are essential in all civil actions except summary and execu-tory proceedings, divorce actions under C.C. art. 102, and proceedings under the Children’s Code; without them all proceedings are absolutely null.
Under La. C.C.P. art. 1201, a judgment rendered against a defendant who has not been validly cited and served with the petition is absolutely null, even if there is actual notice of the suit. In re Justice of Peace Landry, 2001-657 (La.6/29/01), 789 So.2d 1271. Without such citation and service of process, the court does not have jurisdiction over the person of the defendant. Id.
*1052 | lsLa. C.C.P. art. 2002(A)(2) states that a final judgment shall be annulled if it is rendered against a defendant who has not been served with process as required by law and who has not waived objection to jurisdiction, or against whom a valid judgment by default has not been taken.
The exercise of personal jurisdiction requires the submission of the party to the jurisdiction of the court by commencing an action or by the waiver of objection to jurisdiction by failure to timely file the declinatory exception. La. C.C.P. art. 6(A)(3).
When a judgment has been entered against a defendant, the question of sufficiency of service may not be raised for the first time on appeal. Hughes v. Sanders, 36,968 (La.App.2d Cir.5/14/03), 847 So.2d 165. Instead, the issue should be raised in a suit to annul the judgment. Id.
Jimmie timely raised the exception of insufficiency of service of process. Because the proper service of process is a cornerstone of judicial actions, and because a remedy remains to sue to annul a judgment, Jimmie did not waive consideration of the denial of his exception on appeal when he failed to seek supervisory review and instead opted to wait to raise the issue on appeal. The trial court erred in denying Jimmie’s exception of insufficiency of service of process.
CONCLUSION
1 isWith each party to bear its own costs, the JUDGMENT is VACATED and Yvonne Barnett’s claims against Jimmie Barnett are DISMISSED WITHOUT PREJUDICE.

. The three remaining annuities, with account numbers 18495, 32606, and 32608, listed Yvonne as the policyholder.

. There was also a charge of $88.17.

. This amount is one-half of the penalty for account 17168.