STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 CA 0939

CHERYL AND MICHAEL MITCHELL

VERSUS

BATON ROUGE ORTHOPAEDIC CLINIC, L.L.C.
AND ROBERT W. EASTON, M.D.

Judgment Rendered: **DEC 1 7 2020**

* * * * * * *

On Appeal from the 19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Trial Court No. 658229

Honorable Timothy E. Kelley, Judge Presiding

* * * * * * *

Nelson W. Wagar, III                    Attorneys for Plaintiffs/Appellants,
Sarah W. Hickman                        Cheryl and Michael Mitchell
Mandeville, Louisiana


Tara S. Bourgeois                       Attorneys for Defendants/Appellees,
Garrett S. Callaway                     Robert W. Easton, M.D., Baton Rouge
Herbert J. Mang, Jr.                    Orthopaedic Clinic, L.L.C., et al.
Nancy B. Roberts
Baton Rouge, Louisiana


* * * * * * *

**BEFORE:  GUIDRY, McCLENDON, HIGGINBOTHAM,
HOLDRIDGE, AND PENZATO, JJ.**

McClendon J., dissents for Reasons Assigned by Judge Holdridge.
Holdridge J., dissents for reasons assigned

**PENZATO, J.**

Plaintiffs, Cheryl and Michael Mitchell, appeal a trial court judgment in favor of defendants, Robert W. Easton, M.D., Baton Rouge Orthopaedic Clinic, L.L.C., Physician Assurance SPC as part of Y-Bridge Insurance Company, and Baton Rouge Orthopaedic Clinic Segregated Portfolio Company as part of Y-Bridge Insurance SPC (collectively "defendants"), granting an exception raising the objection of prescription and dismissing all of plaintiffs' claims. We affirm.

## FACTS AND PROCEDURAL HISTORY

On August 23, 2015, defendant Dr. Easton performed a left total hip arthroplasty revision on plaintiff Cheryl Mitchell, during which Mrs. Mitchell's sciatic nerve was severed. Plaintiffs filed this medical malpractice action on May 26, 2017, alleging therein that Dr. Easton severed the nerve causing paralysis. Plaintiffs further alleged that Mrs. Mitchell continued treatment with Dr. Easton and that the basis for Dr. Easton's continuing treatment and Mrs. Mitchell's continuing rehabilitation and further surgery was "her belief in and reliance upon the physician/patient relationship and his advice that with such continued care and rehabilitation, on his recommendation, the nerve would regenerate, heal and/or return her leg to a normal or acceptable condition." According to the petition, on November 15, 2016, Dr. Easton advised Mrs. Mitchell that he no longer believed that she would regain the function of her left lower extremity. Defendants filed a peremptory exception raising the objection of prescription on the grounds that plaintiffs' lawsuit, filed on May 26, 2017, alleged the date of medical malpractice as August 23, 2015, and therefore was prescribed because it was not filed within one year of the date of the alleged malpractice or within one year of the discovery of the alleged malpractice.

An evidentiary hearing was held on March 18, 2019. Dr. Easton testified that on August 11, 2015, he performed a left total hip arthroplasty on Mrs.

Mitchell. Following the August 11, 2015 procedure, Mrs. Mitchell re-dislocated her hip, and on August 23, 2015, Dr. Easton performed a revision of the August 11, 2015 arthroplasty. While Mrs. Mitchell was in the recovery room, Dr. Easton noticed that Mrs. Mitchell had foot drop. According to his testimony at the hearing on the exception raising the objection of prescription, he advised Mrs. Mitchell's family and returned Mrs. Mitchell to surgery to determine the cause. During this second surgery, Dr. Easton discovered that Mrs. Mitchell's sciatic nerve was lacerated. Dr. Easton contacted Dr. Rasheed Ahmad, a hand surgeon with experience in nerve repairs. Dr. Ahmad examined the wound and confirmed a fresh laceration in the sciatic nerve. Dr. Ahmad repaired the nerve, and Dr. Easton continued with the remainder of the surgery. Dr. Easton testified that after completing the surgery, he advised Mr. Mitchell of the sciatic nerve injury and subsequent repair. Dr. Easton further testified that the following day, he spoke to Mrs. Mitchell and told her that her sciatic nerve had been lacerated during the hip revision and that Dr. Ahmad had repaired it. He also told Mrs. Mitchell that she had left foot drop as a result of the nerve injury. With regard to the prognosis of her left foot drop, Dr. Easton testified he advised Mrs. Mitchell that "it would take time, and there is a possibility it could recover, there is a possibility it might not recover, but most of the time at a year mark, whatever function you have, that is kind of what you are left with." According to Dr. Easton, he did not tell Mrs. Mitchell that her sciatic nerve was going to regenerate, her left foot drop would completely resolve, she was going to be better in a year, or in a year her left foot would be back to normal.

Dr. Easton testified that upon Mrs. Mitchell's discharge from the hospital following the August 23, 2015 surgeries, she went to inpatient rehabilitation for recovery from her left hip arthroplasty and subsequent revision. On September 30, 2015, Dr. Easton performed a revision of the left total hip arthroplasty. According

to Dr. Easton, he performed this procedure because Mrs. Mitchell continued to have dislocation issues; the procedure was not related to the sciatic nerve injury. Dr. Easton testified that he continued to treat Mrs. Mitchell post-operatively until November 15, 2016, to monitor the hip implant and to examine the joint and prosthesis. He continued to monitor the sciatic nerve injury during that time to determine if Mrs. Mitchell had any feeling or motion but was not treating her for the nerve injury because there was no treatment for said injury. According to Dr. Easton, the only treatment to restore nerve function was the repair that Dr. Ahmed had performed. According to Dr. Easton, he never told Mrs. Mitchell that he would fix, correct, or repair her sciatic nerve injury. He testified that his post-operative treatment was standard for a hip arthroplasty and revision patient and was not directed to or for Mrs. Mitchell's sciatic nerve injury.

At the hearing on the exception, Mrs. Mitchell testified that the morning following her August 23, 2015 surgery, Dr. Easton came to her hospital room and told her that her sciatic nerve had been severed during the revision surgery and he had called in another doctor to "get it back together." According to Mrs. Mitchell, Dr. Easton told her that it was going to take up to a year before they would know the full results of the surgery to repair her sciatic nerve and she should "not give up hope." Mrs. Mitchell testified that during the course of her post-operative visits, Dr. Easton continued to tell her "to wait a year" to determine the outcome of the surgery to repair her sciatic nerve. Mrs. Mitchell acknowledged that she knew that her foot had paralysis on August 24, 2015, but she did not immediately file suit against Dr. Easton because she trusted him. According to Mrs. Mitchell, "He said to give it a year, so that is what [she] did. [She] waited." However, Mrs. Mitchell acknowledged that in a deposition she had previously given in this matter, she testified that although she wanted to believe that her condition would improve

within a year, she did not believe Dr. Easton when he said her condition would improve in a year.

Mrs. Mitchell's daughter, Michelle Goudeaux, also testified at the hearing. According to Mrs. Goudeaux, following the August 23, 2015 surgery, Dr. Easton advised Mrs. Mitchell's family that the sciatic nerve had been severed or ruptured and a hand specialist had been called to repair it. Mrs. Goudeaux testified that Dr. Easton advised the family that he could not guarantee the nerve would come back, but there was a possibility and that it would take time. According to Mrs. Goudeaux, Dr. Easton said, "it would be so many millimeters a day that the nerve would repair itself, and [Mrs. Mitchell] may start to see some feeling from the top of the leg down; it would just take time. It may be six months, it may be a year, it could be longer." Russell Goudeaux, Michelle's husband, also testified that Dr. Easton did not guarantee the nerve would come back, but did say that nerves can repair themselves and within a certain amount of time, six months but typically a year, feeling could return. According to Mr. Goudeaux, Dr. Easton advised that it may be up to a year or a little more before Mrs. Mitchell could start noticing some feeling or movement back in the leg.

At the conclusion of the hearing, the trial court granted the exception and provided oral reasons for judgment. The trial court found that upon review of the medical records as a whole, not just portions of them taken out of context, it was clear that Dr. Easton was providing treatment for Mrs. Mitchell's hip revision and not treating the sciatic nerve at all. The trial court noted that Dr. Easton admitted that there is no treatment for the sciatic nerve and concluded:

> There was no continued treatment of the sciatic nerve issue. The treatment had to do with the regular follow-up of any and every hip replacement patient to get them through the period of being pain-free from the hip replacement.

5

The trial court found no evidence that Dr. Easton attempted to prevent Mrs. Mitchell from availing herself of her cause of action. It noted that no one contested the fact that Dr. Easton immediately disclosed the injury to Mrs. Mitchell after the surgery and that Dr. Easton never told Mrs. Mitchell that the sciatic nerve would actually take a year to heal. Thus, the trial court concluded that there was no evidence that Dr. Easton was "stringing her out or anything like that until the prescriptive period passed." The trial court found that the third category of *contra non valentem*, the "continuous treatment" rule, did not apply. The trial court further recognized that Mrs. Mitchell was given facts sufficient to place a reasonable person on notice that she had a claim long before the one-year prescriptive period after the operation had expired and concluded that plaintiffs' action had prescribed. Finding that *contra non valentem* did not apply, the trial court dismissed the plaintiffs' claims.

The trial court signed a judgment on April 1, 2019, sustaining the exception raising the objection of prescription and dismissing all of plaintiffs' claims.

Plaintiffs appealed, alleging that the trial court erred in sustaining defendants' exception raising the objection of prescription because Mrs. Mitchell remained under continuous treatment by Dr. Easton until November 15, 2016, and a civil action for damages was timely filed within one year of that date.

## LAW AND DISCUSSION

The objection of prescription may be raised by a peremptory exception. La. C.C.P. art. 927(A)(1). Evidence may be introduced to support or controvert an exception of prescription. La. C.C.P. art. 931. If evidence is introduced at the hearing on the peremptory exception, the trial court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. *Clavier v. Our Lady of the Lake Hosp. Inc.*, 2012-0560 (La. App. 1 Cir. 12/28/12), 112 So. 3d 881, 888, writ denied, 2013-0264 (La. 3/15/13), 109 So. 3d 384. Pursuant to this standard,

6

the trial court's ruling must be affirmed unless a reasonable factual basis does not exist for the finding of the trial court, and the record establishes that the finding is clearly wrong. *Expert Riser Solutions, LLC v. Techcrane International, LLC*, 2018-0612 (La. App. 1 Cir. 12/28/18), 270 So. 3d 655, 660. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So. 2d 880, 882 (La. 1993).

Louisiana Revised Statutes 9:5628 establishes the time for filing medical malpractice actions. The statute sets forth two prescriptive limits, namely one year from the date of the alleged act or one year from the date of discovery with a three-year limitation from the date of the alleged act, omission, or neglect to bring such claims. *Carter v. Haygood*, 2004-0646 (La. 1/19/05), 892 So. 2d 1261, 1268. To soften the occasional harshness of prescriptive statutes, Louisiana courts have recognized a jurisprudential exception to prescription: *contra non valentem non currit praescriptio,* which means that prescription does not run against a person who could not bring his suit. *Id.* There are four recognized categories of *contra non valentem*: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. *Kirby v. Field*, 2004-1898 (La. App. 1 Cir. 9/23/05), 923 So. 2d 131, 135, writ denied, 2005-2467 (La. 3/24/06), 925 So. 2d 1230.

Plaintiffs contend that the undisputed facts of this case compel application of the third category of *contra non valentem*, the "continuous treatment" rule. The

7

third category of *contra non valentem* has been held to encompass situations where an innocent plaintiff has been lulled into a course of inaction in the enforcement of his right by reason of some concealment or fraudulent conduct on the part of the defendant, or because of his failure to perform some legal duty whereby plaintiff has been kept in ignorance of his rights. *Carter*, 892 So. 2d at 1269. In certain circumstances, a doctor's continuing professional relationship with his patient might give rise to the suspension or interruption of prescription. *Id.* This interruption or suspension of prescription by the continued existence of a professional relationship is based on the premise that the professional relationship is likely to hinder the patient's inclination to sue. *Id.*

The continuing treatment rule requires a plaintiff to establish the existence of (1) a continuing treatment relationship with the physician, which is more than perfunctory, during which (2) the physician engaged in conduct which served to prevent the patient from availing herself of her cause of action, such as attempting to rectify an alleged act of malpractice. *Carter*, 892 So. 2d at 1271.

Plaintiffs contend that Dr. Easton's reassurances that Mrs. Mitchell would have to wait a year to determine whether the nerve would regenerate was sufficient to suspend prescription, particularly given the fact that her prognosis for regeneration of the sciatic nerve was dubious. Plaintiffs argue that the facts of this case compel a holding consistent with *In re Noe*, 2004-0760 (La. App. 4 Cir. 8/3/05), 916 So. 2d 1138, aff'd in part, rev'd in part, 2005-2275 (La. 5/22/07), 958 So. 2d 617.

In *Noe*, plaintiff received a steroid injection for sinus congestion on June 11, 2001. *Noe*, 916 So. 2d at 1140. Within one week of the injection, a knot developed at the site of the injection, and one month after the injection, plaintiff experienced an increase in pain and suffered atrophy of the buttock muscle. On August 6, 2001, plaintiff returned to her doctor because of persistent pain and

8

discoloration in the injection area, and he placed her on a one-year recovery program and reassured her that it would resolve in time. *Id.* Plaintiff continued to treat with her doctor for the injury. On April 3, 2002, due to plaintiff's increasing symptoms, her doctor referred her to a neurologist and ordered a nerve conduction study and an MRI, which revealed nerve injury relating to the injection. *Id.* Plaintiff filed a medical malpractice claim on March 12, 2003, asserting she learned for the first time in April 2002 that the injection was the cause of her continuing back, buttock, and leg pain. *Id.* The defendant doctor filed an exception raising the objection of prescription, which the trial court granted. The Louisiana Fourth Circuit Court of Appeal reversed, finding that the continuing doctor-patient relationship coupled with the defendant doctor's reassurances of recovery and his treatment plan "thwarted [plaintiff's] inclination to bring suit and prevented the claim from prescribing." *Id.* at 1143. The Louisiana Supreme Court affirmed the decision in pertinent part. *Noe*, 958 So. 2d 617.

In contrast to *Noe*, the record in this case establishes that the trial court's conclusion that there was no continued treatment of the sciatic nerve injury is a reasonable one. Moreover, in this case, the evidence indicates that plaintiffs were aware that Mrs. Mitchell's sciatic nerve had been severed during surgery, causing her foot drop. Unlike the defendant doctor in *Noe*, Dr. Easton did not make assurances of recovery; rather, he advised Mrs. Mitchell that it could take up to a year before they would know the full results of the surgery to repair the nerve. The trial court's finding that there was no evidence that Dr. Easton engaged in any conduct that prevented plaintiffs from filing suit is not clearly wrong. In the absence of any proof of such conduct amounting to fraud, misrepresentation, or intentional concealment by Dr. Easton, the continuing treatment rule is not applicable. *E.g.*, *McCauley v. Stubbs*, 2017-933 (La. App. 3 Cir. 4/25/18), 245 So. 3d 41, 47; *Wilkerson v. Dunham*, 2016-1056 (La. App. 4 Cir. 5/3/17), 218 So. 3d

9

743, 749, <u>writ denied</u>, 2017-0932 (La. 9/29/17), 227 So. 3d 287; *Jimerson v. Majors*, 51,097 (La. App. 2 Cir. 1/11/17), 211 So. 3d 651, 658.

Accordingly, we find that the trial court did not manifestly err in concluding that plaintiffs' claims against defendants have prescribed.

## CONCLUSION

For these reasons, the trial court's April 1, 2019 judgment sustaining the peremptory exception raising the objection of prescription filed by defendants, Robert W. Easton, M.D., Baton Rouge Orthopaedic Clinic, L.L.C., Physician Assurance SPC as part of Y-Bridge Insurance Company, and Baton Rouge Orthopaedic Clinic Segregated Portfolio Company as part of Y-Bridge Insurance SPC, and dismissing all claims by Cheryl and Michael Mitchell against them is affirmed. Appeal costs are assessed to plaintiffs, Cheryl and Michael Mitchell.

**AFFIRMED.**

| CHERYL AND MICHAEL MITCHELL | STATE OF LOUISIANA |
|---|---|
| VERSUS | COURT OF APPEAL |
| BATON ROUGE ORTHOPAEDIC CLINIC, L.L.C. AND ROBERT W. EASTON, M.D. | FIRST CIRCUIT |
| | 2019 CA 0939 |

 **HOLDRIDGE, J., dissenting**

I respectfully dissent. I find that the continuing treatment rule applies in this case to suspend the running of prescription on Mrs. Mitchell's cause of action against Dr. Easton until such time as Dr. Easton's treatment and monitoring of Mrs. Mitchell ended on November 15, 2016. Therefore, this malpractice lawsuit, filed on May 26, 2017, within one year of the date on which the treatment was terminated, is timely.

In order for the continuing treatment exception to prescription to apply to a medical malpractice claim, the plaintiff must establish: (1) a continuing treatment relationship with the physician, which is more than perfunctory in nature, during which (2) the physician engaged in conduct which served to prevent the plaintiff from availing herself of her cause of action, such as attempting to rectify an alleged act of malpractice. **Carter v. Haygood**, 2004-0646 (La. 1/19/05), 892 So.2d 1261, 1271. Both elements are satisfied in this case.

First, the trial court's conclusion that there was no continued treatment of Mrs. Mitchell's sciatic nerve injury by Dr. Easton is not supported by the record and is contrary to the Supreme Court's decision in **Carter**. In this case, after admittedly injuring Mrs. Mitchell's sciatic nerve during the August 23, 2015 hip surgery, Dr. Easton had another physician attempt to repair that injury. Dr. Easton admitted that he continued to monitor the progress of Mrs. Mitchell's nerve injury throughout the course of his continued treatment and monitoring of Mrs. Mitchell's hip condition. Further, due to the type of injury suffered, Dr. Easton confirmed

that monitoring Mrs. Mitchell's progress after the repair of the severed nerve was the only treatment available. He stated, "[t]he treatment of any lacerated nerve is to repair it and hopefully get an end-to-end anastomosis, and then you just have to wait and see." He further testified, "[t]here is really nothing to do with the sciatic nerve injury other than see how she was doing and everything else....I was monitoring to see if she had any feeling or motion." Dr. Easton advised Mrs. Mitchell that "[t]here is a possibility it could recover, there is a possibility it might not recover, but most of the time at the year mark, whatever function you have, that is kind of what you are left with." Accordingly, Dr. Easton's continued treatment and assessment of Mrs. Mitchell's sciatic nerve injury during his treatment of Mrs. Mitchell satisfies **Carter's** requirement that there be a continuing treatment relationship between Mrs. Mitchell and Dr. Easton.

As to **Carter's** second element, without question, Dr. Easton advised Mrs. Mitchell that there was a possibility she could recover from the damage he caused by injuring her sciatic nerve, and he set the time frame of the possible recovery at the one-year mark. I find that Dr. Easton's actions in advising Mrs. Mitchell of the possibility of recovery within a one-year time frame, coupled with his continued treatment of Mrs. Mitchell, which treatment included monitoring of the progress of the sciatic nerve injury, served to effectively prevent Mrs. Mitchell from pursing a lawsuit against him. Mrs. Mitchell was entirely reasonable in relying on Dr. Easton's advice in failing to file a lawsuit against him until after the expiration of the one-year recovery period. If she had significant or full recovery after one year, she may not have filed suit.

The continuing treatment rule was developed to protect the element of trust that is vital to the doctor-patient relationship. See **Carter**, 892 So.2d at 1273. Interruption or suspension of prescription due to a continued professional relationship is based upon the premise that the professional relationship is "likely

to hinder the patient's inclination to sue." **Abrams v. Herbert**, 590 So.2d 1291, 1295 (La. App. 1st Cir. 1991). The facts of this case illustrate precisely why the continuing treatment rule should be applied to suspend prescription on Mrs. Mitchell's claim against Dr. Easton. Dr. Easton lacerated Mrs. Mitchell's sciatic nerve during hip surgery on August 23, 2015, attempted immediately to rectify that error, and advised his patient of the error and the one-year recovery period needed to determine the extent of such injuries. Dr. Easton continued to treat Mrs. Mitchell throughout that one-year recovery period, which included monitoring the progress of both the hip replacement surgery and the sciatic nerve injury he inflicted during that surgery. I find that prescription on Mrs. Mitchell's cause of action against Dr. Easton did not commence to run until the termination of their professional relationship on November 15, 2016. To hold otherwise would force a victim of malpractice to initiate a lawsuit against her physician while the doctor-patient relationship is ongoing and before it is known whether the attempt to rectify the alleged act of malpractice by that doctor in fact succeeded. Such a lawsuit, in most cases, would terminate the doctor-patient relationship and require the patient to find a new doctor. It would also result in the filing of more medical malpractice cases wherein the patient is legally obligated to file suit against her doctor even though she would not have sued had her condition been rectified after a period of time. I do not believe this is the result contemplated by the Medical Malpractice Act. For all of these reasons, I find that the trial court erred in sustaining the prescription objection, and I would remand the matter to the trial court for further proceedings.